**APPOLO FUELS, INC.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5088.

United States Court of Appeals,
Federal Circuit.

Aug. 30, 2004.

Rehearing and Rehearing En Banc
Denied Oct. 7, 2004.*

* Circuit Judges Schall and Bryson did not participate in the vote.

James R. Golden, Denham, Golden and Nagle, of Middlesboro, KY, argued for plaintiff-appellant. Of counsel was Keith A. Nagle.

Mark R. Haag, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Thomas L. Sansonetti, Assistant Attorney General; and Dorothy R. Burakreis, Attorney.

Before SCHALL, DYK, and PROST, Circuit Judges.

DYK, Circuit Judge.

Appellant Appolo Fuels, Inc. ("Appolo") seeks recovery for both a permanent and a temporary regulatory taking of its surface mining leases. It claims that a permanent taking occurred when the Office of Surface Mining Reclamation and Enforcement ("OSM") designated the lands subject to its leases as unsuitable for mining pursuant to 30 U.S.C. § 1272. Alternatively, Appolo seeks compensation for a temporary taking allegedly resulting from extraordinary delay in OSM's decisionmaking process. The Court of Federal Claims granted summary judgment in favor of the government. *Appolo Fuels, Inc. v. United States*, 54 Fed. Cl. 717 (2002). We affirm.

## BACKGROUND

Congress passed the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or the "Act"), Pub.L. No. 95–87, 91 Stat. 445 (codified at 30 U.S.C. § 1201 et seq.), to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a) (2000). The Supreme Court has upheld the constitutionality of the SMCRA. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

Before the enactment of SMCRA, "many surface mining operations result[ed] in disturbances of surface areas that ... destroy[ed] or diminish[ed] the utility of land," among other things, "by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats ... and by counteracting the governmental programs and efforts to conserve soil, water, and other natural resources." 30 U.S.C. § 1201(c). In order to remedy the negative effects of surface mining, SMCRA established a permitting process. The Act required organizations to obtain a permit from the Secretary of the Interior or the relevant state authority before "engag[ing] in or carry[ing] out on lands within a State any surface coal mining operations."[1] *Id.* § 1256(a). Standards were

1. In states that maintain a state SMCRA implementation and enforcement program un-

established governing the grant or denial of permits. *Id.* § 1265. SMCRA established the OSM in the Department of the Interior and gave it authority to administer the Act. *Id.* § 1211.

SMCRA further provided that the Secretary of the Interior or the relevant state authority, depending on which entity is responsible for the enforcement of SMCRA in the particular region, had discretion "[u]pon petition pursuant to subsection (c) of this section, [to] designate an area as unsuitable for all or certain surface coal mining," *id.* § 1272(a)(2), if such surface mining would, among other things, "affect renewable resource lands in which such operations could result in a substantial loss or reduction of long-range productivity of water supply," *id.* § 1272(a)(3).

The process for designating an area as unsuitable for mining begins with the filing of a petition by "[a]ny person having an interest which is or may be adversely affected" by such mining. *Id.* § 1272(c). The regulatory authority must then hold "a public hearing in the locality of the affected area" within ten months of providing "appropriate public notice and publication of the date, time and location of such hearing." *Id.* Finally, the regulatory authority must "[w]ithin sixty days after such hearing, issue and furnish ... a written decision regarding the petition, and the reasons therefore." *Id.* This procedure is known as the "LUM" (lands unsuitable for mining) petition process. The statute thus contemplates that the LUM procedure will be completed approximately one year after giving public notice of the filing of the LUM petition (i.e., ten months plus sixty days). In Tennessee the SMCRA is imple-

mented by the federal Department of the Interior, *see supra* note 1, and the Secretary of the Interior has "delegated to the Director of OSM the authority to make final decisions on land unsuitable petitions." (J.A. at 185.)

Appolo is a Kentucky corporation that entered the mining business in 1972. During the late 1980s, Appolo became aware that its existing coal reserves would be exhausted by the mid 1990s, and it sought to acquire more lands on which to mine. Appolo particularly sought reserves in the Little Yellow Creek watershed (also known as the Fern Lake watershed), a 4,544–acre area situated on the Tennessee–Kentucky border within close proximity to its existing operations, 3,780 acres of which fell within Tennessee. The Tennessee portion of the Little Yellow Creek watershed included within its bounds Fern Lake, which served as the water supply for the city of Middlesboro, Kentucky. In 1989, more than a decade after the enactment of SMCRA, Appolo acquired lease 5A, providing mining rights in approximately 2,600 acres of land within the Yellow Creek watershed. Later that year, Appolo obtained further mining rights in the Little Yellow Creek watershed by acquiring lease 7A. Then in 1992, Appolo purchased 600 acres immediately surrounding Fern Lake in Tennessee.

On February 8, 1994, Appolo filed a SMCRA permit application with OSM to mine 214 acres on its leased land in the Tennessee part of the Little Yellow Creek watershed. Shortly thereafter, the City of Middlesboro, Kentucky, and the National Parks and Conservation Association filed a

der 30 U.S.C. § 1235(d), an organization must obtain the § 1256 permit from the state. 30 U.S.C. § 1256(a); *see also id.* § 1254. Where "the Secretary has promulgated a Federal program [to implement SMCRA] for a State not having a State program," an organi-

zation must obtain a permit from the Secretary of the Interior. *Id.* § 1256(a). In this case, OSM assumed Tennessee's state SMCRA program in accordance with 30 U.S.C. § 1254(b). *See Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1359 (Fed.Cir.2001).

LUM petition with OSM, requesting that all 3,780 acres of land in the Tennessee portion of the Little Yellow Creek watershed ("the petition area") be designated as lands unsuitable for mining. At the time the petition was filed, the only interests held by Appolo within the petition area were the portion of lease 5A in the Tennessee part of the Little Yellow Creek watershed and 367 acres of Appolo's 600–acre fee-simple parcel surrounding Fern Lake. Subsequently on March 30, 1994, OSM notified Appolo that its permit application was "administratively complete" but, in accordance with 30 C.F.R. § 764.15, the application would be held in abeyance until the LUM petition was decided. (J.A. at 215.) The agency further explained that "if OSM reaches a decision to designate parts of the petition area as unsuitable for all or certain types of mining operations, your application could not be approved." (J.A. at 215.) OSM proceeded with the LUM petition review process, which involved preparation of a petition evaluation document ("PED") and an environmental impact statement ("EIS") as required by the SMCRA, 30 U.S.C. § 1272(d), and the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C) (2000).

Meanwhile, in furtherance of its plan to mine the Little Yellow Creek watershed, Appolo acquired lease 14A in February 1995, consisting of approximately 3,200 acres adjacent to lease 5A, approximately 2,300 acres of which were located in the LUM petition area. This lease explicitly recognized that the existing LUM petition could impact a portion of the acreage covered by the lease. Appolo added lease 15A in February 1996, and leases 16A and 17A in June 1996, all of which were adjacent to leases 5A and 14A. Only a small part of the acreage of leases 15A, 16A and 17A was within the LUM petition area.

In May of 1995, Appolo wrote to OSM, inquiring as to the "delay" in OSM's processing of the LUM petition. In response, OSM explained that it was in the process of developing a PED and an EIS for the contested area and that "OSM has not 'intentionally delayed'" this process. (J.A. at 253–54.) Rather, the process had been delayed by a combination of unusual environmental conditions that inhibited access to water samples necessary for the PED and EIS as well as a heavy workload in the OSM field office.

After publishing a draft PED and EIS in the Federal Register in January 1996, OSM issued a final decision on the LUM petition, designating "the entire petition area as unsuitable for all surface coal mining operations" on September 13, 1996. (J.A. at 185.) The Director of OSM described the findings of the PED and EIS that informed his LUM decision:

> Surface coal mining ... conducted within the Fern Lake watershed would significantly impair the water quality of Fern Lake by altering both the physical and chemical characteristics of the water. If surface coal mining operations occurred, chemical changes to the water are predicted to last several hundred years.
>
> . . . .
>
> ... Furthermore, no other domestic water supply of the same quality was identified which it would be economically feasible for the city to utilize.

(J.A. 193–94.) The Director explained that his "most important consideration [in granting the petition] was the impact of surface coal mining operations in the petition area on productivity of the Fern Lake water supply." (J.A. at 196.) Appolo later acquired two more leases containing mining rights within the area designated as unsuitable for mining: lease 18A in September 1997 and lease 19A in August 2001.

In November 1996, Appolo filed a petition for review of OSM's LUM decision in the United States District Court for the Eastern District of Tennessee pursuant to 30 U.S.C. § 1276. *Appolo Fuels, Inc. v. Babbitt,* No. 3:96–CV–952 (E.D.Tenn. Nov. 12, 1996). The district court, however, dismissed the case without prejudice in July 1998 upon Appolo's motion.

Appolo filed this suit in the Court of Federal Claims in January 2000, alleging that OSM's LUM decision constituted a categorical regulatory taking of Appolo's mining interests in the petition area, including portions of leases 5A, 7A, 14A, 15A, 16A, 17A, and 18A, or, in the alternative, that the LUM decision constituted a partial regulatory taking of these mining interests. Appolo also claimed that OSM improperly delayed its decision on the LUM petition beyond the twelve-month period established in 30 U.S.C. § 1272(c), thereby effecting a temporary taking.

Following discovery, the government moved for summary judgment on May 17, 2002. A primary focus of the parties' dispute concerned the relevant parcel for purposes of the takings analysis. The government argued that the relevant parcel was all of Appolo's "coal interests in the petition area and surrounding areas controlled by lease or fee ownership," including the entirety of leases 5A, 7A, 14A, 15A, 16A, 17A, 18A, and 19A. Def.'s Mot. for Summ. J. & Mem. of Law at 34, *Appolo Fuels, Inc. v. United States,* No. 00–1L (Fed.Cl. May 20, 2002). Appolo argued instead that the "the facts at present weigh in favor of using [only] the property which was subject to the LUM decision as the denominator," that is, the portion of leases 5A, 14A, 15A, 16A and 18A fully within the petition area. Pl.'s Combined Br. in Op. to Def.'s Mot. for Summ. J. & In Limine at 29, *Appolo Fuels, Inc. v. United States,* No. 00–1L (Fed.Cl. Sept.5, 2002). Appolo

urged that "[w]ith respect to the 14A Lease ... approximately 92% of the tonnage has been lost [and][o]n the 5A, the percentage is 78%." *Id.* at 49.

The Court of Federal Claims entered summary judgment in favor of the government on December 18, 2002. *Appolo,* 54 Fed. Cl. at 717. The court held that the relevant parcel for the takings analysis could not be limited to the petition area as urged by Appolo. The court, however, also rejected the government's assessment of the relevant parcel, explaining that leases 18A and 19A must be excluded because they were purchased after the LUM decision and that lease 7A must be excluded because "both plaintiff's and defendant's experts agree that the lease provided plaintiff with no reserves with any economic value." *Id.* at 729. Following case law that requires a court to consider a plaintiff's overall business plan in determining the relevant parcel, the court included within the relevant parcel the entirety of leases 5A, 14A, 15A, 16A and 17A as well as Appolo's 600 fee simple acres around Fern Lake because it found that Appolo "viewed [these interests] as part of its overall plan to mine within the Creek watershed." *Id.* at 728–30.

Based on this definition of the relevant parcel, the court rejected Appolo's categorical takings claim because the "plaintiff was not prohibited from exploiting its leases and its fee property in areas outside the petition area," and these portions had value. *Id.* at 732.

Likewise, the Court of Federal Claims rejected Appolo's partial regulatory takings claim. In reaching this decision, the court considered the three *Penn Central* factors applicable to the partial regulatory takings analysis: the plaintiff's reasonable investment-backed expectations; the character of the government action allegedly effectuating a taking; and the economic

impact of the alleged taking. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124–25, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Relying on our decisions in *Rith Energy, Inc. v. United States*, 247 F.3d 1355 ("*Rith I*"), *reh'g denied*, 270 F.3d 1347 (Fed.Cir.2001) ("*Rith II*"), the court held that Appolo lacked reasonable investment-backed expectations:

> Plaintiff commenced its effort to obtain coal mining rights in the [Little Yellow] Creek watershed with the acquisition of Lease 5A in 1989. Thus, this lease was acquired more than ten years after the enactment of SMCRA. The two amendments to Lease 14A expressly stated that a[LUM] petition was pending. Plaintiff's argument that [LUM] petitions are "extraordinary" remedies is unavailing, given that plaintiff has not claimed that it was unaware of the possibility of a[LUM] petition; moreover, such an argument would be disingenuous in light of plaintiff's self proclaimed status as a 20–year veteran of negotiating the SMCRA permitting process.... [Plaintiff] cannot deny that the temporal relationship between the enactment of SMCRA and the time it purchased the parcel at issue gave it notice that it was subject to regulation.

*Appolo*, 54 Fed. Cl. at 733–34. The court also held that the character of the government action cut against Appolo's partial takings claim because mining in the petition area would have constituted a nuisance under Tennessee law, explaining:

> It is clear that water pollution is an abatable nuisance under both Tennessee common law and the [Tennessee Water Quality Control Act of 1977]. By granting the [LUM] petition, OSM exercised its police power to protect its citizens from a nuisance, thereby weighing this factor of the *Penn Central* analysis in the Government's favor.

*Id.* at 735. As to the economic impact prong of the *Penn Central* analysis, the court held that given the investment-backed expectations and nuisance findings, "even a showing of severe diminution in economic value will not result in a compensable partial regulatory taking." *Id.* However, the court continued, even if it had decided that Appolo had legitimate investment-backed expectations and that mining the petition area would not have constituted a nuisance, Appolo still would have "put forth an insufficient showing to generate a genuine issue of fact as to the economic impact prong of the *Penn Central* analysis" because it did not submit any evidence "that it cannot exploit the portions of its leases that lie outside the petition area." *Id.* at 736.

Finally, the Court of Federal Claims rejected Appolo's temporary takings claim, applying the analytic framework established by the Supreme Court in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 332, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), and by our court in *Wyatt v. United States*, 271 F.3d 1090 (Fed.Cir.2001). The court held that OSM's total delay was approximately one year and "[t]o characterize such a delay as extraordinary would not be consistent with the import of Supreme Court and Federal Circuit precedent." *Appolo*, 54 Fed. Cl. at 738.

Appolo appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Court of Federal Claims' grant of summary judgment without deference. *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 799 (Fed.Cir.1993).

### A

■ Appolo first contends that the Court of Federal Claims erred in rejecting

its categorical takings claim. In order to warrant compensation for a categorical taking, a plaintiff must show that the regulation at issue has denied it of "*all* economically beneficial or productive use" of its whole parcel of land. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (emphasis added). Appolo argues that the Court of Federal Claims rejected its categorical takings claim based on a mischaracterization of the relevant parcel and that there was a categorical taking under a proper definition of the relevant parcel. We disagree. Even if the Court of Claims' definition of the relevant parcel was overly broad, an issue we do not decide, Appolo still cannot recover on its categorical takings claim.

■ The Supreme Court has long held that the regulatory takings analysis, with respect to both categorical takings and partial takings, must be applied to the "parcel as a whole." *Penn Central*, 438 U.S. at 130–31, 98 S.Ct. 2646. The Court of Federal Claims properly rejected Appolo's argument that the relevant parcel should have included only those portions within the petition area. The Supreme Court explained in *Tahoe–Sierra* that "defining the property interest taken in terms of the very regulation being challenged is circular" and emphasized that the Court has "consistently rejected such an approach to the 'denominator' question." 535 U.S. at 331, 122 S.Ct. 1465. On appeal, Appolo appears to have abandoned this argument, instead arguing that only leases 5A and 14A should have been included. Appolo concedes that it "will not quibble with the court's inclusion of its 5A or 14A Leases as part of the 'relevant parcel'." (Br. for Appellant at 39–40.) This concession is well taken because lease 5A's and lease 14A's "profitable reserves were the focus of Appolo's expectations,"

(Reply Br. for Appellant at 9), and were purchased as a discrete mining unit. Appolo purchased lease 5A in 1989 as the first step in fulfilling its "expect[ation] that [it] would ultimately acquire and mine all of the surface mineable coal within the Little Yellow Creek watershed," (Br. for Appellant at 10–11), and "Appolo continued its plans for mining within the Fern Lake watershed by acquiring the 14A Lease in February 1995," (*id.* at 17). Under our precedent, the purchase of these two leases as part of one unified mining plan is sufficient to include them in the relevant parcel. *See Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365–66 (Fed.Cir. 1999) (holding that relevant parcel included two tracts of land because their "development was treated as a single integrated project," despite the fact that they were "acquired ... in different transactions at different times, that different local government authorities had regulatory jurisdiction over the two locations, and that the two segments were capable of separate development"); *see also Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1381 ("*Palm Beach I*") (focusing the relevant parcel analysis on whether the owner "planned to develop the parcels as a single unit"), *aff'd on reh'g*, 231 F.3d 1354, *reh'g en banc denied*, 231 F.3d 1365 (Fed.Cir. 2000).

■ Because the relevant parcel includes leases 5A and 14A, Appolo is not entitled to compensation for a categorical taking. It did not lose all economically viable use of these leases. Neither lease falls entirely within the LUM petition area. Appolo had the burden in response to the government's summary judgment motion to present evidence of complete loss of value. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Seiber v. United States*, 364 F.3d 1356, 1371–72

(Fed.Cir.2004). In opposing summary judgment, Appolo claimed that "[w]ith respect to the 14A Lease ... approximately 92% of the tonnage has been lost. On the 5A, the percentage is 78%." Pl.'s Combined Br. in Op. to Def.'s Mot. for Summ. J. & In Limine at 49. But Appolo's expert appraiser only valued the reserves within the petition area. *Id.* And, indeed, Appolo admitted that it did not even instruct its expert to assess the before and after value of this area. *Id.* at 20. Even assuming these percentages are correct, Appolo's showing was insufficient to defeat summary judgment on the categorical takings claim. The Supreme Court has made clear that a categorical taking only occurs when there has been a "complete elimination of value or a total loss" and that "the categorical rule would not apply if the diminution in value were 95% instead of 100%." *Tahoe–Sierra,* 535 U.S. at 330, 122 S.Ct. 1465 (internal quotation marks omitted); *see also Rith II,* 270 F.3d at 1349–50 (holding that a loss of 90% of available coal did not constitute a categorical taking). A showing of a 92% loss of the value of one lease and a 78% loss of the other is manifestly insufficient.

### B

Having rejected Appolo's contention that there has been a categorical regulatory taking, we turn to the partial regulatory takings question.

■ It is a settled principle of federal takings law that under the *Penn Central* analytic framework, the government may defend against liability by claiming that the regulated activity constituted a state law nuisance without regard to the other *Penn Central* factors. *See, e.g., Tahoe–Sierra,* 535 U.S. at 352, 122 S.Ct. 1465; *Lucas,* 505 U.S. at 1010, 112 S.Ct. 2886; *Mugler v. Kansas,* 123 U.S. 623, 662–69, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Palm Beach I,* 208 F.3d at 1383; *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153 (Fed. Cir.1995); *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed.Cir. 1994); *Fla. Rock Indus. v. United States,* 18 F.3d 1560, 1565 n. 10 (Fed.Cir.1994). Appolo concedes this principle, but it argues that the Court of Federal Claims mistakenly held that OSM's LUM decision established existence of a nuisance under Tennessee common law.[2] Appolo argues that OSM did not make a nuisance determination and, in any event, was not empowered to make such a determination as "the LUM decision [and] concomitant 'findings' are made on a different standard than that which applies to the nuisance question in a takings claim." (Br. for Appellant at 31.) Rather, Appolo contends, the Court of Federal Claims was obligated to determine de novo whether surface mining in the petition area would have constituted a nuisance under Tennessee law. We find it unnecessary to resolve this question because we conclude that there has been no taking under the *Penn Central* analysis, quite apart from the nuisance defense.[3]

**2.** OSM's LUM decision concluded:

[Appolo's] surface coal mining operations in the petition area would affect the renewable resource lands in that area and result in a substantial loss in long-range productivity of Fern Lake, which serves as the Middlesborough public water supply. Surface mining would alter the physical and chemical properties of the water stored in the lake.... Mining in the petition area would cause this loss in productivity even if conducted in full compliance with the environmental performance standards of SMCRA.

(J.A. at 195–96.)

**3.** Because we affirm the Court of Federal Claims' holding on grounds other than the nuisance theory, Appolo's challenge to the Court of Federal Claims' grant of the motion in limine (which barred Appolo from litigat-

 As noted above, the *Penn Central* analysis requires us to consider: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646. These factors are considered in terms of the "parcel as a whole." *Id.* at 130–31, 98 S.Ct. 2646.

First, we consider the economic impact of the alleged partial regulatory taking. For purposes of this analysis, we assume the accuracy of Appolo's claim that it lost approximately 78% of lease 5A's value and 92% of lease 14A's value.[4] Even so, we conclude in light of the other two *Penn Central* factors that there has been no partial regulatory taking.

We address first the reasonable investment-backed expectations prong of the *Penn Central* analysis. As a preliminary matter, we must decide the relevant date for assessing Appolo's investment-backed expectations, and in particular whether the enactment of SMCRA in 1977, before acquisition of the leases in question, defeats Appolo's reasonable investment-backed expectations. In *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), a five to four decision, the Supreme Court reversed the Rhode Island Supreme Court's holding that "the post-regulation acquisition of title was fatal to [a] claim for deprivation of all economic use" under the Takings Clause, *id.* at 626, 121 S.Ct. 2448, holding instead that a takings claim "is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction," *id.*

at 630, 121 S.Ct. 2448. The majority opinion did not address the bearing of the regulatory environment at the time of land acquisition on the reasonable investment-backed expectations prong of the *Penn Central* analysis. Justice O'Connor, however, explained in her concurring opinion that the Court's "holding does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis." *Id.* at 633, 121 S.Ct. 2448 (O'Connor, J., concurring). Rather, she affirmed that "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations." *Id.*

 Shortly before the Court's decision in *Palazzolo*, we decided *Rith I*, which raised similar issues concerning investment-backed expectations. We rejected the takings claim, emphasizing that the plaintiff could not have had "a reasonable investment-backed expectation that it would not be subject to ... restraints when it acquired the coal leases [because] SMCRA was enacted eight years before [the plaintiff] purchased the coal leases" at issue. 247 F.3d at 1364. After the decision in *Palazzolo*, the plaintiff-appellant in *Rith* filed a motion for rehearing on the theory that it was "entitled to stand in the shoes of its predecessors who owned before SMCRA" because *Palazzolo* taught that "the mere fact that an owner bought after a regulatory scheme was passed cannot defeat a partial takings claim." *Rith II*, 270 F.3d at 1350. We denied the petition for rehearing, explaining that *Palazzolo*, in light of Justice O'Connor's concur-

---

ing whether its proposed mining would have constituted a nuisance under Tennessee law) is moot.

4. However, we note that this valuation does not take into account the fact that Appolo had

already mined substantial amounts of reserves in the portions of 5A and 14A outside the petition area and that there were potential underground deposits in both areas that could be exploited.

rence, only rejected the theory that "a person who purchases property after the date of the regulation may *never* challenge the regulation." *Id.* (emphasis added). We concluded that *Palazzolo* did not reject the principle that "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations." *Id.* (quoting *Palazzolo*, 533 U.S. at 633, 121 S.Ct. 2448 (O'Connor, J., concurring)). Likewise, we conclude that Appolo's reasonable investment-backed expectations are shaped by the regulatory regime in place as of the date it purchased the leases at issue.

▮ Under such circumstances, our en banc opinion in *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir.2001), instructs us to consider in particular "three factors relevant to the determination of a party's reasonable expectations": (1) whether the plaintiff operated in a "highly regulated industry;" (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have "reasonably anticipated" the possibility of such regulation in light of the "regulatory environment" at the time of purchase. *Id.* at 1348.[5] Here each of these factors argues against a finding of reasonable expectations.

First, as we explained in *Rith II*, the coal mining business is obviously "a highly regulated industry." 270 F.3d at 1351. One has to look no farther than the SMCRA itself to reach this conclusion, and the SMCRA's comprehensive statutory and regulatory system has been in effect since Appolo's early years in the industry and predates Appolo's purchases of any of the leases at issue in this litigation. Second, there is no suggestion here that Appolo was unaware that surface mining was a potentially environmentally hazardous activity. Third, in light of the regulatory environment at the time Appolo purchased the leases at issue, it could have "reasonably anticipated" the possibility of a LUM decision prohibiting the mining of part or all of its leases. Appolo admits that the existence of the Act should play a role in the investment-backed expectations analysis, stating on appeal that it was acutely familiar with the SMCRA statutory and regulatory system and that it "certainly knew that its land would be fettered by regulation-it had successfully pursued its mining operations for years following SMCRA." (Reply Br. for Appellant at 13; *see also* Br. for Appellant at 7 ("Appolo not only survived SMCRA's passage; it thrived by adapting its methods to the Act's requirement.... Its demonstrated competence in complying with SMCRA was a key to formation of its expectations of mining the property at issue.").) Appolo contends, however, that years of practical experience in the mining industry led it to believe that a LUM petition would not be filed in the first instance and once filed, would not be granted by OSM, and that "whether the prospect of such a petition should have impacted Appolo's reasonable

---

5. While *Commonwealth Edison* considered reasonable investment-backed expectations in the context of a due process claim, the *Commonwealth Edison* analysis is equally applicable in the takings context. *See Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed.Cir.2003); *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 n. 42 (Fed.Cir. 2003). A plaintiff's subjective expectations are irrelevant to the reasonableness of the expectations. *See Cienega Gardens*, 331 F.3d at 1346 n. 42 ("We of course agree that a party's subjective expectation is irrelevant to whether that expectation is reasonable."). Nonetheless, the plaintiff must show that it had an actual expectation that it would not be subjected to the regulatory restriction. *Id.* at 1346.

expectations is a question of fact for trial." (Reply Br. for Appellant at 14–15.)

Appolo's argument is not convincing. In some circumstances the determination of reasonable expectations may require a factual hearing. *See Chancellor Manor*, 331 F.3d at 904, 906; *Cienega Gardens*, 331 F.3d at 1353. But there are also circumstances where the question of reasonable expectations can be resolved without a factual hearing merely by the examination of the legal regime existing at the time of the action or acquisition. *Commonwealth Edison* was such a case. There we held that determination of reasonable investment-backed expectations "does [not] require an evidentiary trial," 271 F.3d at 1348, because examination of the common law and federal regulations at the time of the activity in question established the absence of reasonable expectations, *see id.* at 1356. This too is a case in which examination of the regulatory regime at the time Appolo's lease acquisitions occurred is sufficient, and no hearing is required. SMCRA was enacted long before the acquisition of Appolo's leases, and it provides explicitly for LUM determinations. 30 U.S.C. § 1272. The statute gave notice sufficient to defeat Appolo's reasonable expectations by providing for a process by which OSM could designate lands as unsuitable for mining under a broad array of circumstances. *Id.*[6] Appolo has identified no regulatory decision pursuant to SMCRA that would have suggested that the LUM petitions were unavailable in the circumstances such as the ones here. In *Commonwealth Edison* we explained that "[t]he reasonable expectations test does not require that the law existing at the time · of processing would impose liability." 271 F.3d at 1357. Rather, "[t]he critical question is whether extension of existing law could be foreseen as reasonably possible." *Id.* Here, the "broad scope" of the SMCRA's LUM provisions made OSM's designation of Appolo's lands as unsuitable for mining "easily foreseen, not necessarily as a certainty, but as a reasonable possibility." *Id.*

■ Finally, under *Penn Central* we consider the character of OSM's decision to declare the Tennessee portion of the Little Yellow Creek watershed as unsuitable for mining. Relying on findings in the PED and EIS, OSM concluded that surface mining in the Little Yellow Creek watershed "would significantly impair the water quality of Fern Lake ... [effecting] chemical changes to the water [that] are predicted to last several hundred years." (J.A. at 193.) OSM also emphasized that Fern Lake is the only "domestic water supply of the same quality ... [that] it would be economically feasible for the city [of Middlesboro] to utilize." (*Id.* at 194.) This decision closely parallels the government action at issue in *Rith*, the denial of a permit under the SMCRA in order to prevent potentially contaminated runoff into a water supply. In *Rith* we described the

---

6. Section 1272 states, in pertinent part:

[A] surface area may be designated unsuitable for certain types of surface coal mining operations if such operations will—
 (A) be incompatible with existing State or local land use plans or programs; or
 (B) affect fragile or historic lands in which such operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems; or

 (C) affect renewable resource lands in which such operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products, and such lands to include aquifers and aquifer recharge areas; or
 (D) affect natural hazard lands in which such operations could substantially endanger life and property, such lands to include areas subject to frequent flooding and areas of unstable geology.
30 U.S.C. § 1272(a)(3).

government character of this action as an exercise of the "police power directed at protecting the safety, health, and welfare of the communities surrounding the . . . mine site by preventing harmful runoff [into local water supplies]." *Rith II*, 270 F.3d at 1352.[7] So too, OSM's LUM decision is "the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations." *Id.*

Based on our analysis of the *Penn Central* factors, we conclude that Appolo's lack of reasonable investment-backed expectations is coupled with government action designed to protect health and safety. As in *Rith*, we think that these factors taken together outweigh Appolo's economic injury, even if it was severe. *See id.* at 1352 (denying compensation despite the fact that "the regulatory action in this case caused a substantial diminution in the value of [the appellant's] coal leases"). Consequently, we affirm the rejection of Appolo's partial regulatory takings claim.

## C

 Appolo's final contention on appeal is that the Court of Federal Claims incorrectly denied its claim for a tempo-

rary taking. Appolo was prohibited from mining in the petition area during the pendency of the LUM petition because Appolo's application for a mining permit was held in abeyance during that period in accordance with 30 C.F.R. § 764.15. Appolo contends that OSM's eighteen-month delay in reaching a LUM decision (beyond the statutorily mandated one-year time frame) constituted a temporary taking of its mining rights in the petition area from February 15, 1995 (one year and one day after the filing of the LUM petition), to September 13, 1996 (the date OSM granted the petition).

 Delay in the regulatory process cannot give rise to takings liability unless the delay is extraordinary. *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1352 (Fed.Cir.2002) ("[A]bsent denial of a permit, only extraordinary delays in the permitting process ripen into a compensable taking."). If the delay is extraordinary, the question of temporary regulatory takings liability is to be determined using the *Penn Central* factors. *Id.* The eighteen-month delay here is far short of extraordinary. *See, e.g., Tahoe–Sierra*, 535 U.S. at 306, 122 S.Ct. 1465 (holding that a thirty-two month moratorium on develop-

---

7. To the extent that Appolo argues that the motion in limine was improperly granted because it should have been allowed to challenge the LUM decision's health and safety findings, our case law teaches otherwise. *See, e.g., Rith II*, 270 F.3d at 1352 ("[I]n a takings case we assume that the underlying governmental action was lawful."); *M & J Coal*, 47 F.3d at 1154 ("It is incontestable that OSM's actions were legitimate exercises under SMCRA to prevent harm to the public health and safety.... [The plaintiff] had chosen not to challenge the validity of OSM's enforcement actions by way of a district court action.... Neither the Court of Federal Claims nor this court may entertain a collateral challenge to the validity of OSM's actions."); *Tabb Lakes*, 10 F.3d at 802–03

("[C]laimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act."); *Fla. Rock Indus. v. United States*, 791 F.2d 893, 905 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) ("We hold that the trial court committed an error of law in investigating and determining, notwithstanding the district engineer's finding that there was at least some *de jure* pollution to be anticipated from Florida Rock's project, in reality there was none. The apparent purpose was to sustain the assessment of taking liability for injury inflicted by a regulation, but the alleged taker had a right, in the Claims Court, to have the claim assessed on the basis that its regulatory action was valid and correct in all respects.").

ment was not extraordinary delay); *Wyatt*, 271 F.3d at 1097–100 (finding that there was no extraordinary delay despite a nearly ten-year permitting process); *see also Tahoe–Sierra*, 535 U.S. at 346–47, 122 S.Ct. 1465 (Rehnquist, C.J., dissenting) (concluding that delays of six years or more should be considered per se takings). Even if the delay were considered extraordinary, we have already determined that application of the *Penn Central* factors here does not support a finding that there was a permanent regulatory taking.

Where, as here, a permanent restriction does not constitute a compensable permanent regulatory taking, it would be strange to hold that a temporary restriction imposed pending the outcome of the regulatory decisionmaking process requires compensation. A temporary restriction is necessarily less burdensome to the property owner than a permanent restriction. In this case, Appolo offers no reason why the temporary restriction should be held to be a regulatory taking (when the permanent restriction is not) other than that the delay created uncertainty. The existence of uncertainty stemming from delay in the regulatory decisionmaking process and the consequent difficulty of business planning, at least in the circumstances here, cannot create liability for a temporary taking where application of the *Penn Central* factors mandates a conclusion that a permanent restriction does not create takings liability.

## CONCLUSION

For the foregoing reasons, we affirm the Court of Federal Claims' grant of summary judgment in favor of the government.

*AFFIRMED.*

## COSTS

No costs.