# In the United States Court of Federal Claims

**No. 11-877C**

**(Filed: August 30, 2013)**

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
AAA PHARMACY, INC.,                 *
                                    *          Summary Judgment; Fifth
         Plaintiff,                 *          Amendment Taking; Medicare Part
                                    *          B, 42 U.S.C. 1395 et seq. (2000); 42
         v.                         *          C.F.R. § 405.874; Regulatory Taking;
                                    *          Extraordinary Delay; Revocation and
THE UNITED STATES,                  *          Reinstatement of Medicare Billing
                                    *          Privileges; Bad Faith.
         Defendant.                 *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Mark S. Kennedy, Kennedy Attorneys & Counselors at Law, 12222 Merit Drive, Suite 1750, Dallas, TX, for Plaintiff.

Stuart F. Delery, Jeanne E. Davidson, Donald E. Kinner, and Jane C. Dempsey, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Delores Thompson, Debbie Anne Belcher, and Laura L. Fahey, U.S. Department of Health and Human Services, Office of the General Counsel, 1301 Young Street, Suite 1138, Dallas, TX, Of Counsel.

_____

## MEMORANDUM OPINION AND ORDER
_____

**WILLIAMS, Judge.**

In this Fifth Amendment takings action, Plaintiff, AAA Pharmacy, Inc., claims that by revoking and failing to timely reinstate its Medicare billing privileges, the Government effected a taking of its business. Plaintiff submits that by the time the Government reinstated its Medicare billing privileges, its business had failed.

Defendant filed a Motion for Summary Judgment arguing that Plaintiff cannot prove it suffered a compensable taking. For the reasons that follow, the Court denies Defendant's motion.

1

## Background[1]

### Medicare Statutes and Regulations[2]

The Supplementary Medical Insurance Benefits for the Aged and Disabled program ("Medicare Part B") provides the elderly and persons with disabilities limited coverage for durable medical equipment, prosthetic devices, prosthetics, orthotics and other supplies ("DMEPOS"). 42 U.S.C.A. §§ 1395j, k, m, o, x(s) (West, 2005); 42 C.F.R. §§ 414.200-232 (2005). Medicare Part B is administered by private entities known as carriers that contract with and are overseen by the Centers for Medicare and Medicaid Services ("CMS"), a division of the U.S. Department of Health and Human Services ("HHS"). 42 U.S.C.A. § 1395(u) (West, 2005). A carrier may contract with CMS to act as the National Supplier Clearinghouse ("NSC") for DMEPOS suppliers. 42 C.F.R. § 421.210 (2005).

A NSC reviews DMEPOS supplier enrollment applications to determine whether to issue an applicant a billing number. Id.; 42 C.F.R. §§ 424.57, 489.13(c)(2) (2005). If an applicant meets the standards in 42 C.F.R. § 424.57(b)-(c), the NSC may issue a billing number to allow the supplier billing privileges, including the right to receive Medicare reimbursement for covered items and services the supplier provides.

The Supplier Audit and Compliance Unit ("Compliance Unit"), a division of a NSC, monitors enrolled suppliers to ensure continued compliance with 42 C.F.R § 424.57(b)-(c). If a supplier ceases to comply, the NSC, acting as a delegee of the Government, with CMS, will revoke the supplier's billing number. 42 C.F.R. §§ 424.57(d), 405.874(b) (2005). "Revocation is effective 15 days after the [NSC] mails [the supplier] notice of [NSC's] determination." 42 C.F.R. § 405.874(b) (2005). Once billing privileges are revoked, the supplier may no longer service Medicare beneficiaries or receive Medicare reimbursement. Id.

After a supplier receives notice of revocation, the supplier has 90 days to request a hearing before a neutral party or file a corrective action plan ("CAP"). Id. at (b)-(c), (f). According to the Government, a CAP should "contain[] verifiable evidence of the

---

[1] The factual background is derived from the appendices to the parties' motion papers, and should not be construed as the Court's findings of fact.

[2] The background describing the Social Security Act, the Medicare Program, and its implementing regulations is derived from 42 U.S.C.A. § 1395 et seq. (West, 2005), and 42 C.F.R. §§ 405.201–426.587 (2005). Since 2005, the Act's implementing regulations have been amended on a number of occasions. See, e.g., Medicare and Medicaid Program; Regulatory Provisions to Promote Program Efficiency, Transparency, and Burden Reduction, 77 Fed. Reg. 29028 (May 16, 2012); Medicare Program; Hospital Outpatient Prospective Payment System and CY 2007 Payment Rates, 71 Fed. Reg. 68228 (Nov. 24, 2006). In this opinion, the Court refers to the regulations in place at the time of the revocation of Plaintiff's Medicare billing privileges in 2005.

supplier's compliance with the Medicare supplier requirements at the time of revocation," that permits the NSC to reinstate the billing privileges. Def.'s Mot. Summ. J. ("Def.'s Mot.") 4, A119-20, January 14, 2013; 42 C.F.R. § 405.874(f) (2005). After reviewing a CAP, if the NSC determines the supplier is still noncompliant with one or more standards, the revocation will remain in place, although the supplier retains the right to request a hearing within the prescribed time limitations. 42 C.F.R. § 405.874(b) (2005).

If a supplier requests a hearing, the NSC must schedule a hearing within one week of receipt of the request. 42 C.F.R. § 405.874(c) (2005). Within two weeks of the hearing, the hearing officer must issue a decision. Id. Either party may appeal the officer's decision to an administrative law judge within 60 days. CMS Pub. 100-08, Change Request 3601 (Jan. 14, 2005).[3] A supplier may seek review of the administrative law judge's decision with the HHS Departmental Appeals Board, and subsequently, may seek judicial review of the full administrative appeal in district court. Id. at (d)(3); 42 U.S.C. § 1395cc(j)(2) (Supp. V 2005); 42 U.S.C. § 405(g) (2000); CMS Pub. 100-08, Change Request 3601 (Jan. 14, 2005); see Anderson v. Sullivan, 959 F.2d 690, 692 (8th Cir. 1992); see also Ahmed v. Sebelius, 710 F. Supp. 2d 167, 172-73 (D. Mass. 2010).

**The Revocation of Plaintiff's Medicare Billing Privileges**

Plaintiff, now a defunct business, previously operated in Oklahoma as a licensed pharmacy and DMEPOS supplier with Medicare billing privileges. Compl. ¶ 32, Dec. 14, 2011; Def.'s Mot. 7, A15.[4] While Plaintiff "filled prescriptions for private pay individuals, insurance beneficiaries, Medicare beneficiaries, and Medicaid beneficiaries," Plaintiff alleges that "[t]he vast majority of [its] business was done through Medicare beneficiaries." Compl. ¶ 5.

Although physically located in Hobart, Oklahoma, Plaintiff conducted a large portion of its business through the mail, doing business in 28 states. Def.'s Mot. A1, A15-A16; Compl. ¶ 9.

On or about February 2005, Plaintiff "moved its license" from 530 Main Street, Hobart, Oklahoma to 304 S. Broadway, Suite C, Hobart, Oklahoma, but continued to maintain its records at the 530 Main Street address. Def.'s Mot. A16.

On March 1, 2005, the CMS "AR/OK Ombudsman" conducted an in-service visit at Plaintiff's 304 S. Broadway address, and according Plaintiff, the Ombudsman

---

[3] The administrative law judge serves on the HHS Medicare Appeals Council.

[4] The record does not specify when Plaintiff obtained a Medicare supplier billing number, but it indicates that Plaintiff began operations in or about the fall of 2004. See Def.'s Mot. Summ. J. ("Def.'s Mot.") A18, January 14, 2013 (a letter stating that as of December 29, 2005, Plaintiff had "only been in business approximately a year and a half").

determined Plaintiff was in compliance with supplier standards, including requirements imposed by the Americans with Disabilities Act.  Id. at A16, A22.

After receiving a complaint from a Medicare beneficiary claiming Plaintiff was making unsolicited phone calls, the NSC's Compliance Unit reviewed Plaintiff's supplier-specific information and determined Plaintiff was potentially noncompliant with eight standards.  Id. at A110.

On September 20, 2005, a NSC fraud analyst sent Plaintiff an official notice of the Compliance Unit's findings -- that Plaintiff was "in violation of one or more of the 21 DMEPOS supplier standards . . . ."  Id. at A1.  According to this notice, Plaintiff was noncompliant, or potentially noncompliant, with:

- Standard 1:  failing to provide a current copy of its license to operate in each state it did business;
- Standard 2:  failing to provide updated information about its move within Hobart;
- Standard 5:  failing to advise Medicare beneficiaries that they could rent or purchase inexpensive or routinely purchased durable medical equipment, and the purchase option for capped rental durable medical equipment;
- Standard 7:  failing to provide a handicap-accessible physical facility;
- Standard 11:  making unsolicited marketing calls to Medicare beneficiaries;
- Standard 13:  failing to document communications with Medicare beneficiaries;
- Standard 19:  failing to provide a copy of its beneficiary complaint resolution protocol; and
- Standard 20:  failing to maintain a complaint log to track beneficiary complaints.

Id. at A1-A3.  The notice also stated in pertinent part:

> Please be advised that you are allowed 21 calendar days from the date of this letter to provide the [Compliance Unit] with information that may allow us to verify your full compliance with the DMEPOS supplier standards.  If you fail to comply with the 21-day deadline, the [Compliance Unit] may initiate actions to revoke your Medicare DMEPOS supplier number.

Id. at A2-A3.

4

In response, Howard Senter, "President AAA Pharmacy, Inc.," contacted the analyst some seven days later. Id. at A16, A111.[5] Plaintiff alleges: (1) the analyst telephonically advised Mr. Senter to visit the CMS website, download the "CMS 855S forms, fill them out and send them to the [NSC];" and (2) Mr. Senter thereafter filled out these forms and sent them to the NSC on or about September 29, 2005. Id.[6] In contrast, Defendant contends it did not receive any documentation from Plaintiff in response to the official notice, and there is no documentary evidence substantiating that Plaintiff submitted the forms or provided a written response. Id. at A111. Rather, Defendant claims that "several weeks passed [following the issuance of the official notice] without recei[pt of] any documentation from [Plaintiff] regarding the compliance issues," and the NSC's Compliance Unit requested and obtained CMS approval to revoke Plaintiff's supplier number. Id.

On December 15, 2005, the NSC's Compliance Unit issued a revocation notice advising Plaintiff that its billing number would be revoked within 15 days -- by December 30, 2005 -- since Plaintiff had not demonstrated full compliance with supplier standards. Id. at A4-A7. The revocation notice contained all of the same concerns cited in the official notice, adding a ninth allegation of noncompliance:

- Standard 21: failing to providing CMS with information demonstrating regulatory compliance.

Id. at A6. The revocation notice further indicated that the decision to revoke Plaintiff's billing number had "the concurrence" of the CMS, and directed:

You have the right to contest this decision by requesting a hearing. If you request a hearing, an independent fair hearing officer will conduct this hearing. A request for a hearing must be made within 90 *days* from the *postmark* of this notice.

[I]nstead of requesting a hearing, a supplier may first complete a Corrective Action Plan (CAP) and provide CMS/NSC with sufficient evidence that you have fully complied with all Medicare requirements. NSC/CMS may reinstate your supplier number after it reviews your CAP and any additional evidence you submit and determines you are in

---

[5] The record contains contradictory information regarding the date of the conversation. A letter dated December 29, 2005 from Plaintiff's counsel states that the conversation took place on September 27, 2005, whereas a letter from a NSC director dated June 23, 2006 says this conversation occurred on September 26, 2007. Id. at A16, A111.

[6] According to a NSC director, "Mr. Senter was informed that he needed to follow the instructions on the 9/20/05 letter and submit any documents he felt relevant to demonstrate compliance in writing to the [NSC's Compliance Unit] for consideration." Id. at A111.

5

compliance with all supplier standards. However, while a hearing officer's unfavorable decision may be appealed . . . a decision . . . based on [a] review of a CAP is not appealable. (citation omitted) The Supplier number will be activated on the date CMS . . . accepted the [CAP].

Id. at A4, A6 (emphasis in original).

On December 27, 2005, Plaintiff's counsel sent a "Request for Appeal of Revocation of Supplier Number or Corrective Action Plan (CAP)" letter to the NSC's Hearings and Appeals division via overnight mail, and faxed a copy to the analyst. Id. at A12. This request noted that: (1) after Plaintiff received the revocation notice on December 22, 2005, Plaintiff's president attempted to contact the NSC on December 23, 2005, but found the NSC's office "closed for the holiday season;" (2) "[i]t [was] imperative that [the] Hearings and Appeals Department consider an extension of time or a [CAP] prior to revoking [Plaintiff's] Medicare supplier number;" and (3) Plaintiff would address the noncompliance allegations within "a relatively short period of time." Id. Aside from the title of the letter, there was no further reference to appealing the revocation or requesting a hearing before a neutral party. Id. at A12-A13; see 42 C.F.R. § 405.874(b) (2005).

On December 29, 2005, Plaintiff sent the NSC a second letter requesting an opportunity to provide supporting documents as to why revocation was unwarranted. Def.'s Mot. A14. Plaintiff reiterated:

We would greatly appreciate the opportunity to address and provide supporting documents . . . as to why we believe the revocation is unwarranted or at least can be brought into compliance prior to closing AAA Pharmacy. We would greatly appreciate an extension of time or [a Corrective Action Plan] prior to [revocation of Plaintiff's] supplier number.

Id. The same day, Plaintiff's counsel sent the NSC a separate letter in further support of Plaintiff's request that the NSC not revoke the supplier number. Id. at A15. This letter was sent to the NSC via overnight mail and faxed to the attention of both the analyst and "Hearings and Appeals." Id. It addressed each of the concerns identified in the revocation notice, provided documents regarding Plaintiff's regulatory compliance, and recounted Mr. Senter's September 2005 conversation with the analyst. Id. at A15-A56. The letter also advised that Mr. Senter mailed the CMS forms on or about September 29, 2005, without retaining a copy of such forms, and informed the NSC that Mr. Senter was sending a "second [downloaded] Form 855C" to the NSC via overnight mail. Id. at A18.

On December 29, 2005, the same date Plaintiff and its counsel submitted letters, the NSC revoked Plaintiff's supplier billing number. Id. at A77, A88.

The NCS received the December 29, 2005 letter from Plaintiff's counsel on December 30, 2005. Id. at A111. The record indicates the NSC interpreted this letter to

be a corrective action plan. Id. at A31, A111. Specifically, the "NSC Hearings and Appeals Assignment Sheet" dated December 30, 2005 indicates the NSC received a "corrective action plan" from Plaintiff. Id. at A31; see also id. at A57, A88 (a hearing decision affirming that the NSC had received Plaintiff's CAP but as of December 30, 2005, had still found Plaintiff non-compliant with standards one and five). This Assignment Sheet also indicates the NSC "ordered" a site visit, noted that the NSC required additional information from Plaintiff, and stated, "Complete appeal by: 2/28/06." Id. at A31.

On January 31, 2006, the NSC conducted a site visit of Plaintiff's office. Id. at A32-A56. On February 22, 2006, the NSC acknowledged receipt of Plaintiff's "corrective action plan," but advised it was "still unable to reinstate [Plaintiff's] supplier number" as it had determined that Plaintiff was "still not in compliance" with one or more standards. Id. at A57. The NSC further informed Plaintiff:

> If you are dissatisfied with this decision, you may request a hearing. If you request a hearing, you must file your request within 90 days from the postmark of the initial revocation letter. Failure to timely request a hearing is deemed a waiver of all rights to further administrative review.

Id. at A57.

Plaintiff alleges that following receipt of the NSC's February 22, 2006 letter, Mr. Senter had another telephonic conversation with the analyst, who stated that Plaintiff was "his target and he would not back down from his findings, no matter that they might be incorrect." Compl. ¶ 26.

On March 2, 2006, Plaintiff sent the NCS's Hearings and Appeals division a certified letter expressly requesting a hearing, stating, "As time is of the essence[,] [Plaintiff] would appreciate your earliest consideration." Def.'s Mot. A59. On March 6, 2006, the NSC prepared a "NSC Hearings and Appeals Assignment Sheet" dated March 6, 2006, indicating it had received a request from Plaintiff for a hearing. Id. at A76; see also id. at A88 (a hearing decision finding that the NSC received Plaintiff's hearing request on March 6, 2006). The same sheet states, "Complete appeal by: 3/21/06." Id. at A76. Despite the notation that the appeal would be completed by March 21, 2006, the NSC did not refer the matter to a hearing officer until March 20, 2006, two weeks after receiving the hearing request. Def.'s Mot. A76, A81. On March 22, 2006, a hearing officer sent Plaintiff a letter scheduling a telephonic hearing for March 24, 2006. Id. at A82.

The officer conducted the hearing as scheduled, and on April 10, 2006, 17 days later, issued a decision finding Plaintiff "in compliance with all 21 standards at the time of the revocation," and recommended retroactive reinstatement of the supplier billing number. Id. at A87-A88. The hearing decision also found:

- The supplier number had been revoked on December 29, 2005;

7

- The NSC had denied Plaintiff's corrective action plan on December 30, 2005; and
- The NSC had received Plaintiff's request for a hearing on March 6, 2006.

Id. at A88.

Though the NSC reinstated Plaintiff's supplier number and did not appeal the hearing officer's decision, Plaintiff alleges the NSC continued to withhold monies owed Plaintiff from "prior submitted claims." Compl. ¶ 30. Plaintiff further claims that "[a]s of mid April 2006, [it] had not done any business with Medicare and Medicaid beneficiaries due to the late December 2005 revocation of its provider agreement and billing number," and that as a result, "Plaintiff had to close its doors for good." Id. at ¶ 32.[7]

## Procedural History

Plaintiff initially filed suit in federal district court in Oklahoma. The United States District Court for the Western District of Oklahoma dismissed the majority of Plaintiff's claims against the NSC and its agents -- dismissing the taking and due process claims without prejudice -- allowing Plaintiff to commence this action in the Court of Federal Claims. AAA Pharmacy, Inc. v. United States, 108 Fed. Cl. 321, 326 (2012).

On November 20, 2012, this Court issued an opinion dismissing Plaintiff's non-takings claims for lack of jurisdiction. Id. at 327, 329, 331. This matter now comes before the Court on Defendant's Motion for Summary Judgment. Defendant avers that Plaintiff is unable to prove a taking and, as such, Defendant is entitled to judgment as a matter of law.

## Discussion

## Summary Judgment Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the United States Court of Federal Claims; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." Id. at 250. A fact is material if it "might affect the outcome of the suit . . . ." Id. at 248.

The moving party bears the burden of establishing the absence of any material fact, and any doubt over factual disputes will be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citations omitted). Once this burden is met, the onus shifts to the non-movant to demonstrate sufficient evidence of a dispute over a material fact that would allow a

---

[7] The date Plaintiff "closed its doors" is not in the Complaint or the record.

reasonable finder of fact to rule in its favor. <u>Liberty Lobby</u>, 477 U.S. at 256-57. A court does not weigh each side's evidence when considering a motion for summary judgment, but "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam). "The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." <u>Dairyland Power Co-op. v. United States</u>, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). Additionally, in the summary judgment context, a court "may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter." <u>Mansfield v. United States</u>, 71 Fed. Cl. 687, 693 (2006) (citation omitted).

**Fifth Amendment Takings**

The Fifth Amendment of the United States Constitution proscribes the taking of private property "for public use, without just compensation." U.S. Const. amend. V, cl. 4. "'Real property, tangible property, and intangible property, all may be the subject of takings claims.'" <u>Acceptance Ins. Cos. v. United States</u>, 583 F.3d 849, 854 (Fed. Cir. 2009) (quoting <u>Conti v. United States</u>, 291 F.3d 1334, 1338-39 (Fed. Cir. 2002) (citation omitted)). A taking can be in the form of either an actual physical invasion of a property interest, or a regulatory taking where a government regulation "goes too far." <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1014-15 (1992) (citing <u>Pa. Coal Co. v. Mahon</u>, 260 U.S. 393, 415 (1922)); <u>see also</u> <u>Acceptance Ins.</u>, 583 F.3d at 854; <u>Wyatt v. United States</u>, 271 F.3d 1090, 1096 (Fed. Cir. 2001). Both types of takings may be either permanent or temporary. <u>See</u> <u>First English Evangelical Lutheran Church v. County of Los Angeles</u>, 482 U.S. 304, 318 (1987); <u>Cooley v. United States</u>, 324 F.3d 1297, 1305 (Fed. Cir. 2003).

In determining whether a particular governmental action constitutes a taking, courts employ a two-part test. <u>Acceptance Ins.</u>, 583 F.3d at 854. First, a court must determine whether the plaintiff has identified a cognizable property interest it asserts has been taken. <u>Id.</u> "'Second, after having identified a valid property interest, the court must resolve whether the governmental action at issue amounted to a compensable taking of that property interest.'" <u>Air Pegasus of D.C., Inc. v. United States</u>, 424 F.3d 1206, 1213 (Fed. Cir. 2006) (quoting <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d 1363, 1372 (Fed. Cir. 2004)). The court does "not reach this second step without first identifying a cognizable property interest." <u>Air Pegasus</u>, 424 F.3d at 1213.[8]

In its complaint, Plaintiff alleges it has a property interest in its business which was taken as a result of Defendant's failure to comply with regulations governing the revocation hearing. Compl. ¶ 35. Plaintiff alleges that "[b]y failing to provide the

---

[8] Defendant appears to assume arguendo that Plaintiff alleged a valid Fifth Amendment property interest, and the Court does not reach this issue in deciding this motion.

prescribed regulatory due process, Defendant violated Plaintiff's Constitutional right to due process prior to the 'taking' of Plaintiff's business." Id.

## Genuine Issues of Material Fact Preclude Summary Judgment

"[R]egulatory takings jurisprudence . . . is characterized by 'essentially ad hoc, factual inquiries,' [Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978)], designed to allow 'careful examination and weighing of all the relevant circumstances.' [Palazzolo v. Rhode Island, 533 U.S. 606, 636 (2001) (O'Connor, J. concurring)." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002). Here, Plaintiff alleges that the action which took its business was the delay in scheduling and holding a hearing before a neutral officer -- a hearing that ultimately resulted in the reinstatement of its Medicare billing privileges. Pl.'s Resp. Summ. J. ("Pl.'s Resp.") 4-8, Mar. 27, 2013. On the other hand, Defendant argues that a "[d]elay in the regulatory process cannot give rise to . . . temporary taking liability unless the delay is extraordinary." Def.'s Mot. 18. Defendant argues that even delays of several years have not supported takings liability, and as such, the alleged delay of approximately three months cannot constitute an extraordinary delay.

Defendant is correct that only extraordinary delays give rise to takings liability. See Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351 (Fed. Cir. 2004) ("Delay in the regulatory process cannot give rise to takings liability unless the delay is extraordinary. (citation omitted)"); Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004) (citation omitted). As the Federal Circuit noted, "The Supreme Court, as well as our own court and other sister circuits, have recognized that 'extraordinary delays' typically last for a substantial length of time." Bass, 381 F.3d at 1366 (citations omitted) (emphasis added). Based on the limited record at this juncture, this Court cannot conclude whether this is a "typical" case, or whether the delay here can be deemed extraordinary in the context of the applicable regulatory scheme.

As the Federal Circuit explained, "[t]he question of whether a delay is extraordinary is not a simple matter of the number of months or years taken by the Government to make its decision . . . ." Id. While "'delay is inherent'" in complex regulatory schemes, a court should "examine 'the nature of the . . . process as well as the reasons for any delay' to determine if the delay is disproportionate to the regulatory . . . scheme from which it arises." Id. (quoting Wyatt, 271 F.3d at 1098). Here, the regulatory process for challenging a revocation of Medicare billing privileges has characteristics suggesting that time is of the essence. In particular, the NSC must schedule a hearing within one week of a request, and the hearing officer must issue a decision within two weeks of the hearing -- both short time frames in the realm of federal administrative procedure. 42 C.F.R. § 405.874(c)-(d) (2005). Given this regulatory scheme's express recognition that a hearing and decision on the revocation of Medicare billing privileges must be effected expeditiously, a finding of extraordinary delay here may not require as long a delay as in other contexts. As the Federal Circuit noted, determining whether a delay is extraordinary entails an inquiry which is highly fact specific and requires evaluation of "a number of factors." Bass, 381 F.3d at 1366.

10

Here, there are genuine issues of material fact concerning the nature and circumstances of the referenced delay. For example, there is a fundamental issue as to when Plaintiff requested a revocation hearing. Defendant would have the Court find that the request for a hearing was not made until March 6, 2006, when the NSC received Plaintiff's March 2, 2006 letter. Def.'s Mot. 17-18, A76, A88. In contrast, Plaintiff claims it transmitted its request for a hearing no later than December 29, 2005. Compl. ¶ 1; see also Pl.'s Resp. 19. Plaintiff's own records are confusing on the issue. While the subject line of Plaintiff's December 27, 2005 letter is denominated a "Request for Appeal of Revocation of Supplier Number or Corrective Action Plan (CAP)," the text of the letter seeks an extension of time before revocation or the opportunity to file a CAP. Def.'s Mot. A12-A13, A59.

Defendant's records are also unclear as to when the appeal process should have been completed. A NSC Hearing and Appeals Assignment Sheet dated December 30, 2005 indicated that the NSC received Plaintiff's CAP but stated that the completion date for the appeal was February 28, 2006, while a NSC Hearing and Appeals Assignment Sheet dated March 6, 2006 listed March 21, 2006 as the appeal completion date. Id. at A31, A76.

Defendant further argues that to find extraordinary delay, a court must find bad faith on the part of the Government. Defendant contends Plaintiff "has not alleged that the [NSC's] failure to provide a timely hearing and decision were done in bad faith." Id. at 27. However, Plaintiff did claim that the NSC analyst who investigated the matter stated that Plaintiff "was his target and he would not back down from his findings, no matter that they might be incorrect." Compl. ¶ 26. This allegation is tantamount to an allegation of bad faith, as such a communication is "'hard to explain absent bad faith.'" Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 130 (2010) (citing Beta Analytic Int'l, Inc. v. United States, 61 Fed. Cl. 223, 226 (2004). In the same vein, the analyst found that as of September 20, 2005, Plaintiff was noncompliant with one or more standards, while a site visit by the CMS AR/OK Ombudsman on March 1, 2005 found Plaintiff compliant with the very same standards. Compare Def.'s Mot. A2 (letter from analyst claiming Plaintiff was not handicap accessible), with Def.'s Mot. A16 (Plaintiff's letter to the NSC explaining that the CMS AR/OK Ombudsman had found the facility in full compliance with Medicare standards during a March 1, 2005 site visit, including requirements imposed by the Americans with Disabilities Act).[9] Plaintiff further alleges the analyst "clearly ignored the [edicts of a relevant Nevada] statute and refused to reinstate the provider agreement" even after Plaintiff submitted evidence of its compliance with the Nevada statute -- evidence which the neutral hearing officer subsequently accepted as proof of compliance. Compl. ¶ 28; Def.'s Mot. A89.

---

[9] The NSC's records indicate it accepted information gleaned from the March 1, 2005 site visit as proof of Plaintiff's compliance with applicable standards. See Def.'s Mot. at A22.

11

In sum, Plaintiff alleges facts that may give rise to a regulatory taking. There are genuine issues of material fact as to when Plaintiff requested the revocation hearing, the length of the NSC's delay in scheduling the hearing, and whether the analyst acted in bad faith. Based on this record, the Court cannot determine whether the alleged delay was extraordinary in the context of the regulations governing the revocation of Medicare billing privileges.

### Conclusion

Defendant's Motion for Summary Judgment is **DENIED**. The parties shall propose a joint schedule for further proceedings on or before **September 15, 2013**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**