CANE TENNESSEE, INC. and
Colten, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–237 L.

United States Court of Federal Claims.

Jan. 25, 2005.

716

Matthew D. Slater, Washington, DC, for plaintiffs.

Kristine S. Tardiff, with whom was Thomas L. Sansonetti, Assistant Attorney General, United States Department of Justice, Washington, DC, for defendant. Daniel W. Kilduff, Office of the Solicitor, United States Department of the Interior, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

This matter comes before the court on Defendant's Renewed Motion for Summary Judgment as to Cane's Permanent Regulatory Takings Claim (Def.'s Mot.). For the following reasons, defendant's motion is DENIED on the issue of economic impact based on the genuine issues of material fact concerning Cane's timber valuation. Defendant's motion is GRANTED on the issue of reasonableness of Cane's investment-backed expectations.

## I. Background

For ease of reference, the court provides a summary review of the facts in this case.[1] Plaintiffs, Cane Tennessee, Inc. (Cane) and Colten, Inc. (Colten) own property in Bledsoe County, Tennessee. Plaintiffs allege a right to just compensation for a taking of their mineral interests and other property as a result of certain regulatory action by the government. *See* Complaint in 00–513 L

---

1. Facts cited to the pleadings of only one party do not appear to be in dispute. A full discussion of the facts in this matter can be found in *Wyatt v. United States*, 271 F.3d 1090 (Fed.Cir.2001), rev'g E. Minerals Int'l, Inc. v. United States (Eastern Minerals), 36 Fed.Cl. 541 (1996), as well as in this court's earlier opinions, reported as *Cane*

*Tennessee, Inc. v. United States*, 44 Fed.Cl. 785 (1999) (*Cane I*), *Cane Tennessee, Inc. v. United States*, 54 Fed.Cl. 100 (2002) (*Cane II*), *Cane Tennessee, Inc. v. United States*, 57 Fed.Cl. 115 (2003) (*Cane III*), and *Cane Tennessee, Inc. v. United States*, 62 Fed.Cl. 481 (2003) (*Cane IV*).

(2000 Compl.) ¶ 2.[2] Plaintiffs specifically assert that the June 17, 2000 decision of the Secretary of the Interior (Secretary) to designate as unsuitable for surface mining land encompassing and adjacent to plaintiffs' property, and the petition process resulting in the decision, amounted to a taking of their property. *Id.* The land unsuitable for mining (LUM) petition process was established in 1977 by the enactment of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 (1986) (SMCRA or the Act).

The court has considered several summary judgment motions by the parties in this matter. Most recently, the court conducted a regulatory takings analysis as set forth in *Pennsylvania Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (*Penn Central*) and determined that there was "no taking" with respect to either the Cane property or the Colten property. *Cane III*, 57 Fed.Cl. at 129, 131. The court also determined that there was no temporary taking with respect to either the Cane property or the Colten property. *Id.* at 134. The court granted summary judgment and directed the entry of judgment in favor of defendant. *Id.*

Plaintiffs moved for reconsideration under Rule 59(a) of the Court of Federal Claims (RCFC). *See Cane IV*, 62 Fed.Cl. at 482. On reconsideration, the court reaffirmed its finding that the relevant parcel for assessing the economic impact of the Secretary's unsuitability determination is the entire Cane property. *See id.* at 484–85 (finding that Cane acquired the tracts as a single property, managed the tracts as a single investment over time, and executed a single development plan for the tracts); *Cane III*, 57 Fed.Cl. at 123 n. 10 (observing that the " 'parcel as a whole' is the entire Cane property"); *Cane II*, 54 Fed.Cl. at 106–08 (explaining that the

acquisition of property includes the rights to mine coal and to cut timber). The court also reaffirmed its prior ruling that a comparison of the market value of the relevant parcel as a whole immediately before and after the governmental regulatory action is the proper method for assessing economic impact. *Cane IV*, 62 Fed.Cl. at 486 (citing *Cane III*, 57 Fed.Cl. at 124 (citation omitted)).

On reconsideration, the court also reviewed its decision on the issues of the "timber valuation data" used in the court's takings analysis and the reasonableness of the plaintiffs' investment-backed expectations. *See id.* at 485–90. With respect to the timber valuation issue, the court found that a proper determination of the fair market value of plaintiffs' timber included consideration of the "circumstances affecting harvesting costs and similar matters." *Id.* at 487. Because the parties' experts had not included these considerations in their respective timber valuation opinions and because "the issues of beetle infestation, the existence of streamside management zones and the costs associated with salvage could involve genuine issues of material fact which preclude summary judgment on the issue of timber valuation," *id.* at 487, the court granted plaintiffs' motion for reconsideration of the timber valuation issue, *see id.* at 490. With respect to the reasonableness of the plaintiffs' investment-backed expectations, the court determined that additional factual development and supplementary briefing would be appropriate in light of the Federal Circuit's decision in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed.Cir.2003), and in light of plaintiffs' assertions that the absence of record evidence on plaintiffs' knowledge about the possibility of an unsuitability petition reflected the parties' failure to raise the issue during prior rounds of discovery. *Cane IV*,

---

**2.** The complaint, which was filed on August 25, 2000, was docketed as Case No. 00–513 L. That action was consolidated into an earlier filed action, docketed as Case No. 96–237 L. In the complaint filed in 1996, Case No. 96–237 L, plaintiffs alleged that a taking resulted from the government's refusal to grant mining permits to Cane's lessee, Eastern Minerals International, Inc. (Eastern Minerals) and Colten's lessee, Van Buren Minerals Corporation (Van Buren). Complaint in 96–237 L (1996 Compl.) ¶¶ 1, 5, 84, 90,

**95.** On summary judgment motion, the court found that Colten did not have a takings claim because neither Colten nor Van Buren, its lessee, had ever submitted an application for a permit to mine. *Cane I*, 44 Fed.Cl. at 790. The court also found that Cane had a cognizable property interest in the mineral royalties it reserved pursuant to the Eastern Minerals lease and denied summary judgment on defendant's laches defense. *Id.* at 792, 796.

62 Fed.Cl. at 490. For those reasons, the court granted plaintiffs' motion for reconsideration on the issue of plaintiffs' investment-backed expectations. *Id.*

Further to the parties' Joint Status Report of October 24, 2003, and in accordance with Orders dated October 28, 2003, March 5, 2004, and May 4, 2004, the parties completed an eight-month supplementary discovery period regarding the issues of economic impact and investment-backed expectations. *See* Orders dated October 28, 2003, March 5, 2004, and May 4, 2004 (collectively, Orders). At the conclusion of the supplementary discovery period, defendant moved for leave to file a renewed motion for summary judgment as to Cane's permanent regulatory takings claim. The court granted that motion for leave and now considers defendant's motion and the responsive briefing thereto.[3]

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Rules of the Court of Federal Claims (RCFC) 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to proffer such evidence. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Any doubts about factual issues are resolved in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *See H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). "[W]hen appropriate to the circumstances," a court may grant summary judgment in a takings case. *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996).

### B.  Regulatory Takings Analysis

■ The basic analytical framework for determining whether a taking has occurred is set forth as a three-part test in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The *Penn Central* test considers the economic impact on the claimant, the extent to which the governmental action has interfered with distinct investment-backed expectations, and the character of the governmental action. *See Penn Central*, 438 U.S. at 124–25, 98 S.Ct. 2646. The court now examines the first two prongs of the *Penn Central* test in light of the parties' supplemental factual discovery.[4]

#### 1.  Economic Impact on Cane

■ In this renewed motion for summary judgment, defendant asserts that because

---

3. The briefing before the court includes Defendant's Memorandum in Support of Its Renewed Motion for Summary Judgment as to Cane's Permanent Regulatory Takings Claim (Def.'s Mot.), Cane's Opposition to the Government's Renewed Motion for Summary Judgment (Pl.'s Opp.) and Defendant's Reply in Support of its Renewed Motion for Summary Judgment as to Cane's Permanent Regulatory Takings Claim (Def.'s Reply).

4. In *Cane III*, the court found that "[i]n this case, the character of the governmental action considered by itself neither requires nor forecloses a finding of a taking." 57 Fed.Cl. at 129. The parties have not sought reconsideration of the court's determination on the issue and the court does not disturb its earlier finding.

"Cane's timber had significant market value as of June 2000," Def.'s Mem. at 8, the "property retained significant economic value despite the use restriction imposed under SMCRA," *id.* at 5. Defendant argues that plaintiffs bear the burden of proving, by an "[o]bjective '[m]arket [v]alue' standard," that the economic impact of the government's action warrants compensation. *See* Def.'s Mem. at 4–5 (quoting *Cienega Gardens,* 331 F.3d 1319, 1340 (Fed.Cir.2003) (stating that it is "a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation" for a takings claim) and citing *Forest Props., Inc. v. United States,* 177 F.3d 1360, 1367 (Fed.Cir.1999) (stating that plaintiff bears the "burden of proof to establish a regulatory taking")). Defendant contends that, after an eight-month period of discovery, Cane has failed to meet its burden of proof. *See* Def.'s Mem. at 13–15, 28–29. In support of this contention, defendant specifically points to: (1) Cane's failure to produce a market value timber valuation for the date of the alleged taking, *id.* at 15–16, 18–19, (2) Cane's consideration of events that occurred well after the date of the alleged taking in its timber valuation analysis, *id.* at 16–17, and (3) Cane's failure to quantify the impact of the beetle infestation, the streamside management zones, slash disposal costs and replanting costs on the value of the timber, *id.* at 19–28.

Defendant argues that Cane's most recent expert report, the 2004 Black/Swafford Report, "challenge[s] the determination of market value by [d]efendant's appraiser," but does not contain an appraisal of the Cane property by Cane's own expert "or otherwise offer [an] opinion of the *market value* of the property as of June 2000." *Id.* at 16 (emphasis added). Defendant asserts that the 2004 Black/Swafford Report, "[l]ike the [s]tricken [d]eclaration that [p]receded it, [i]s [b]ased on [i]nformation [d]erived [f]rom [e]vents [t]hat [o]ccurred [w]ell [a]fter the [a]lleged [d]ate of [t]aking," *id.,* and improperly offers a calculation of the "subjective value of Cane's timber 'to Cane,' " *id.* at 18. "Although the 2004 Black/Swafford Report briefly discusses the factors [p]laintiff claims would, if considered, 'probably' reduce the value of Cane's timber," defendant contends that Mr. Black "has not actually determined the adjustments that, in his view, should be made to the $3.9 million stumpage value set forth in his 2001 report." *Id.* at 21. Because plaintiffs have presented *"no* evidence regarding the market value of [its] property after the alleged date of taking," defendant asserts that Cane cannot meet its burden of establishing compensable economic impact as a result of the government's regulatory action in this case. *Id.* at 30.

Cane argues that it has satisfied its burden of proof on the economic impact issue because it has provided a coal valuation and a timber valuation that show a severe diminution in property value as a result of the taking. Pl.'s Opp. at 8. Citing the court's decisions in *Cane III* and *Cane IV,* plaintiffs state that valuation is determined in this case by "compar[ing] the coal value taken to the coal value plus the timber value before the taking," *id.* at 8–9, and refer to this method of measuring economic impact as the "Coal–Timber Formula," *see id.* at 9–10. Cane contends that in accordance with the "Coal–Timber Formula," it has produced expert evidence valuing the coal reserves and timber on its property. *Id.* at 10. Challenging defendant's reliance on a land appraisal by its expert that excludes consideration of Cane's coal value, plaintiffs assert that the "Land Appraisal Formula" is not the proper method of determining the value of the property after the taking. *Id.* at 10–11. Cane also challenges defendant's use of stumpage value, defined as the " 'value of the standing timber' at one moment time," in assessing the value of the timber on plaintiff's land. *Id.* at 18–19 (quoting *Thomas Creek Lumber & Log Co. v. United States,* 19 Cl.Ct. 710, 713 (1990)).

Cane asserts that "[o]nly a[d]iscounted [n]et [i]ncome [a]nalysis [m]ay be [u]sed for [the] [c]oal and [t]imber [v]aluation in this case." *See id.* at 16–21. Cane explains that "[a] discounted net income analysis considers, among other factors, the expected income to be received from the sale of the [property interest], capital expenditures, and labor and production costs, and reduces the net to a present value." *Id.* at 17. Citing its

own expert report (which values Cane's timber over a ten-year period), see Defendant's Supplemental Appendix in Support of its Renewed Motion for Summary Judgment as to Cane's Permanent Regulatory Takings Claim (Def.'s Supp.App.) Ex. 92 (the 2004 Black/Swafford Report) at 1332, Cane contends that, because a Timber Management Plan considers both income and costs generally over an extended period, see Pl.'s Opp. at 19–20, it "is the only reliable way to meaningfully value timber over time," id. at 22. Plaintiffs argue that, contrary to defendant's assertions, their experts, Michael Black and Ronald Swafford, did consider "the southern pine beetle's effect on and the required salvage of the Cane timber[ ] to the extent it was reasonably foreseeable in June 2000" in evaluating the timber value after the issuance of the Secretary's unsuitability decision. Id. at 22 n. 9. Plaintiffs also argue that their expert did consider but did not include the impact of the streamside management zones in his Timber Management Plan valuation analysis because Mr. Black determined that "it is not practicable to harvest any timber in a streamside management zone." Id. Plaintiffs contend that the amount of credit to be afforded their expert's timber valuation is a disputed issue of material fact that precludes the entry of summary judgment on the issue of economic impact. See id. at 24–25.

Before addressing the parties' arguments in more detail, the court briefly reviews the context in which defendant's renewed motion for summary judgment on this issue arises. In Cane IV, the court considered plaintiffs' motion for reconsideration of the court's opinion in Cane III, in which the court granted defendant's motion for summary judgment dismissing the takings claims of plaintiffs Cane and Colten. See Cane IV, 62 Fed.Cl. at 482; Cane III, 57 Fed.Cl. at 134. Plaintiffs asserted in Cane IV that the court had used improper timber valuation data in its takings analysis and complained that "the timber valuation data the court used in its takings analysis was directly against the grain of plaintiffs' contrary record evidence." 62 Fed.Cl. at 482 (internal quotation omitted). In particular, plaintiffs complained that the valuation of the timber on Cane's property at $3,944,313 by their own expert

Michael Black, a forest and wildlife consultant, in an expert report dated January 18, 2002, on which the court had relied in its takings analysis, " 'greatly overstated the timber value on Cane's property' because it did not reflect any downward adjustment in value" for southern pine beetle infestation, the existence of streamside management zones and the costs associated with salvage. Id. at 485–86.

Addressing the considerations pertinent to a determination of the economic impact of the governmental regulatory action in this case, the court stated in Cane IV:

Ascertaining the proper timber valuation of plaintiffs' property was part of the court's analysis of the economic impact of the regulatory action in this takings case. As ... stated in its [Cane III ] Opinion, "[e]conomic impact for a takings analysis is determined by comparing the market value of the property at a moment in time just before the government action with the market value [of the same property] just after the government action." Cane [III], 57 Fed.Cl. at 124 (citing Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) ("[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property.")) The government action triggering the takings analysis in this case occurred on June 17, 2000 when Secretary Babbitt issued his letter of decision designating a significant portion of plaintiffs' property unsuitable for surface coal mining. See Cane [III], 57 Fed.Cl. at 120. In this case, the valuation determination compared the coal value (what plaintiffs lost) with the fair market value of the property just before the taking, measured as the coal value plus the timber value. Id. at 123–125.

Cane IV, 62 Fed.Cl. at 486. In assessing the value of Cane's timber, the parties' experts had estimated the "stumpage" value of the timber, a value defined in the case law as the market value of all standing timber on a property. See id. After examining the stumpage valuation methods of the parties' experts as more fully explained by the par-

ties, the court found that, contrary to the guidance in the case law, the parties' experts had not included in their respective timber valuation opinions appropriate consideration of "the issues of beetle infestation, the existence of streamside management zones and the costs associated with salvage." *Id.* at 486–87. Recognizing that genuine issues of material fact could exist with respect to the unconsidered issues in the stumpage value estimates rendered by the parties' experts, the court concluded on reconsideration that entry of summary judgment on the issue of timber valuation was not proper. *Id.* at 487. By agreement of the parties and further to three Orders, the parties conducted an eight-month period of discovery. *See supra* at Part I.

Based on the parties' discovery, plaintiffs' experts Messrs. Black and Swafford[5] prepared the 2004 Black/Swafford Report, which proposed a timber valuation based on a discounted net income analysis and critically reviewed defendant's expert's appraisal report and defendant's supplemental timber valuation report.[6] Def.'s Supp.App. Ex. 92 at 1314. Citing the 2004 Black/Swafford Report and the coal valuation analysis contained in the February 2002 Supplemental Boyd Report prepared by another of plaintiffs' experts, *see* Def.'s Supp.App. Ex. 55 at 640 (2002 Boyd Report), plaintiffs estimate that, as of June 2000, the alleged date of the taking, Cane's timber had a negative value of -$193,040 to -$43,240 but that Cane's coal was worth $3,889,000. *See* Pls.' Opp. at 24 (citing Def.'s Supp.App. Ex. 55 at 692 (2002 Boyd Report) and Def.'s Supp.App. Ex. 92 at 1336 (2004 Black/Swafford Report)). Plaintiffs argue that the proper measure of Cane's timber value should be obtained from a Timber Management Plan, which "examine[s] the likely future income of a given tract of land over time and … permit[s] a net income analysis," *id.* at 19, rather than from an estimate of "[s]tumpage value [which] renders a total gross revenue that assumes the instantaneous sale of all timber on the land without considering the costs to the landowner," *id.* at 18–19 (emphasis omitted).

In the 2004 Black/Swafford Report, plaintiffs' expert Mr. Black asserts that "[a] fully and properly constructed Timber Management Plan, traditionally designed for a ten-year period, can correctly account for the value of the timber on the Cane properties." Def.'s Supp.App. Ex. 92 at 1332. He opines:

> If hired in June 2000 to manage timber on the Cane properties, I would have immediately begun drafting a Timber Management Plan. The plan would include management of all acres over the long term. In a typical ten-year plan,[ ] I identify the various timber stands, determine which stands contained the most merchantable trees, and decide the timing, organization, and method of each cut. The plan would include measures to replant timber to assure a continual, if cyclical, harvest. Economic conditions and harvesting practicalities would cause revenue streams to vary significantly year to year. . . .
>
> . . . .
>
> [W]hile I cannot guess the exact nature of a June 2000 Timber Management Plan, I do know the basic actions that would have been associated with that plan. If presented with the Cane properties in June 2000 and told to get the maximum profit possible from the timber, my first and primary priority would be to salvage the over mature pine timber. As of June 2000, any forester would have recognized the dire situation facing the pine timber on the Cane properties. When pine timber becomes mature, it becomes weak and

5. Mr. Ronald Swafford, of Ronald H. Swafford Realty & Auction Company, is identified as a broker/appraiser. *Def.'s Supp.App.* Ex. 92 at 1311 (2004 Black/Swafford Report). As indicated in this opinion, plaintiffs' experts prepared separate portions of the report.

6. Although defendant's experts Dr. Burak and Mr. Williams prepared separate reports, *see* Def.'s Supp.App. Ex. 90 (Sizemore Appraisal of 8,613 Acres of Cane's Timberland Property dated 1/31/04 prepared by Dr. Burak) (Defendant's Appraisal); Def.'s Supp.App. Ex. 91 (Supplemental Timber Inventory and Valuation Report dated 1/31/04 prepared by Mr. Williams) (Defendant's Supplemental Timber Report), plaintiffs' experts did not prepare separate assessments of the two reports prepared by defendant's experts. Rather, plaintiffs' experts addressed both defendant's experts' reports in the 2004 Black/Swafford Report. *See* Def.'s Supp.App. Ex. 92 at 1314.

more susceptible to various elements. The risk that these weakening pines will die increases with each passing season. The pine timber on the Cane properties was economically mature and at an ever increasing risk of catastrophic loss due to insects, storm, or ice damage.

The conditions facing the over mature pine timber on the Cane properties in June 2000 was even more dire than normal, as the combination of three years of hot, dry summers and warm winters, poor soil conditions on the Cumberland Plateau, and drought increased the likelihood that some element, such as wildfire, wind, ice, disease, or insects, would significantly damage the value of the pine timber. Additionally, as of June 2000, it was evident that the region potentially faced a serious economic impact from the southern pine beetle in the coming years....

Accordingly, it would have been clear to me in June 2000 that the only sensible plan was to harvest this most vulnerable and most valuable timber as quickly as possible, or Cane would lo[ ]se all the value in this over mature pine timber....

[A Timber Management] [P]lan is exactly what I recommended and what we executed on the Main Tract when I was brought on to salvage the pine timber in November 2000.... [T]he actual value to Cane as determined in the discount cash flow analysis is a fair representation of the value that a June 2000 Timber Management Plan would determine. That discount cash flow analysis is produced in Table 2, below.... [I]f I had constructed a Timber Management Plan in June 2000, it would have likely rendered a present value of -$193,240 to -$43,240 as of June 2000.

Def.'s Supp.App. Ex. 92 at 1332–36 (footnote omitted).

Messrs. Black and Swafford also include in the 2004 Black/Swafford Report their assessment of the supplemental timber valuation opinion offered by defendant's expert Wayne Williams, a forest management operations coordinator in Alabama. The assessment addresses the issues raised in the court's *Cane IV* opinion, in particular, stumpage price and valuation of Cane's timber, the impact of the southern pine beetle infestation on Cane's timber value in June 2000, the relationship of the acreage contained in the streamside management zones to Cane's timber value in June 2000, and the relationship of slash disposal costs to Cane's timber value in June 2000. *See* Def.'s Supp.App. Ex. 92 at 1327–32 (2004 Black/Swafford Report); *see also* Def.'s Supp. Ex. 91 at 1264–84 (Defendant's Supplemental Timber Report). As an initial matter, Mr. Black opines that, contrary to defendant's expert's suggestion that stumpage value includes all costs associated with a market sale of timber, *see* Def.'s Supp.App. Ex. 91 at 1265–66, "[s]tumpage value includes associated costs to the *buyer* ... [but] does not include the variety of costs of sale born[e] by the [landowner] *seller* " in Cane's position. Def.'s Supp.App. Ex. 92 at 1327 (2004 Black/Swafford Report).

With respect to Mr. Williams' decision not to make further adjustments for southern pine beetle damage because his prior calculations reflected consideration of the beetle damage in the stumpage prices, *see* Def.'s Supp.App. Ex. 91 at 1270 (Defendant's Supplemental Timber Report), Mr. Black agreed with defendant's expert that the "stumpage prices for pine timber were depressed during the southern pine beetle epidemic." *Id.* at 1327–28. Mr. Black stated, however, that because the dying or dead beetle-infested trees would not have been merchantable trees, they should have been "removed from the total timber volume to enable a more accurate valuation." *Id.* at 1328. Mr. Black offered no opinion about what the proper reduction in timber volume might be.

With respect to Mr. Williams' adjustment to his prior calculations to include an estimate of the harvestable timber from the streamside management zones, *see* Def.'s Supp.App. Ex. 91 at 1280, Mr. Black agreed that "from a theoretical and a Best Management Practices guideline standpoint, ... certain trees in a streamside management zone may be harvested, as long as a certain percentage and [certain] types of trees remain." Def.'s Supp.App. Ex. 92 at 1328. But Mr. Black opined that "as a practical matter, it would be too difficult and prohibitively expensive to conduct such a select cut." *Id.*

Without offering an estimate of the appropriate dollar amount allocable to the total amount of timber in the streamside management zones in this case, Mr. Black stated that "a proper total volume of timber must be discounted for the entirety of the streamside management zones." *Id.* at 1329.

Mr. Black challenges the treatment by defendant's experts Mr. Williams and Dr. Burak of slash disposal costs, which are "writ[ten] ... off as a 'capital expense because it is site preparation for the next rotation of forest crop and enhances the site for survival of the seedlings, seeds or sprouts.'" *Id.* (quoting Def.'s Supp.App. Ex. 91 at 1280 (Supplemental Timber Report)); *see also* Def.'s Supp.App. Ex. 90 at 1151 (Defendant's Appraisal) (including site preparation costs as a capital expenditure "generally ... recovered as depletion (or by cost basis) at the time of timber harvest"). Explaining that "[s]lash disposal is conducted on Cane's property to reduce fuel hazard to limit the effects of wildfires and arson on the property," Mr. Black asserts that such costs are "not a capital expense, but [are] an operating expense [that] should be included in [a timber valuation] analysis." Def.'s Supp.App. Ex. 92 (2004 Black/Swafford Report) at 1329. But Mr. Black does not quantify the amount of slash disposal costs to be considered in the timber valuation analysis.

Although Mr. Black agrees with Dr. Burak's opinion that a typical Timber Management Plan "would 'provide for the subsequent regeneration and harvests of stands to provide regulated timber production in perpetuity,'" [7] *id.* at 1329–30 (quoting Def.'s Supp.App. Ex. 90 at 1210 (Defendant's Appraisal)), he complains that Dr. Burak has relied on natural regeneration and has "fail[ed] to include ... site preparation and planting costs" in his calculations, *id.* at 1330. Mr. Black concedes that natural regeneration "is the best option for regrowth of hardwood

timber" but asserts that it "is not the best option for regrowth of pine timber." *Id.* Although he stated that replanting costs for pine timber must be included in a timber valuation, *id.*, Mr. Black does not offer a quantitative estimate of those costs.

With respect to Dr. Burak's estimate of Cane's annual net operating costs, *see* Def.'s Supp.App. Ex. 90 at 1151, 1211, plaintiffs' expert Mr. Swafford asserts that, based on Cane's operating expenses in 1999, Cane's annual net operating expenses exceed Dr. Burak's estimate of $8613 ($1 per acre) by $32,982. *See* Def.'s Supp.App. Ex. 92 at 1331. Mr. Swafford states that Dr. Burak's "suggestion that possible hunting and recreational licenses would generate income that would offset operating expenses reveals [his] unfamiliarity with the Cane properties." *Id.* (citing Def.'s Supp.App. Ex. 90 at 1151, 1211). Mr. Swafford asserts that, because the local residents enjoy "unfettered access to the property" by an unmaintained county road through the Main Tract, Cane's previous efforts to prevent unlicensed access to its properties have resulted in the setting of retaliatory fires. *Id.* at 1331–32. Mr. Swafford opines that any reliance on hunting and recreational licenses to offset operating costs "is highly suspect." *Id.* at 1332.

The 2004 Black/Swafford Report also evaluates and seeks to discredit each of the three valuation methods, specifically, the cost approach, the sales comparison approach, and the income capitalization approach, used by defendant's expert, Dr. Steven Burak. *See* Def.'s Supp.App. Ex. 92 at 1315–26 (2004 Black/Swafford Report); *see also* Def.'s Supp.App. Ex. 90 at 1138, 1180–1215 (Defendant's Appraisal). With respect to the cost approach "which sums the value of the timber and the value of the cutover land to arrive at a total value of the property," [8] Def.'s Supp.App. Ex. 92 at 1315, Mr. Swafford states that "[t]ypically a willing buyer

---

7. Dr. Burak's expert report estimates that of the total 8,613 acres of Cane's property, a little more than one percent of the acreage cannot be used for growing trees. *See* Def.'s Supp.App. Ex. 90 at 1150 (Defendant's Appraisal). He also estimates that total timber volume on Cane's property is approximately fifty-three percent of hardwood types of timber and the balance of the

timber volume is a pine-type of timber. *Id.* at 1150–51.

8. "Cutover land" is land "with no seedlings capable of growing into merchantable timber." Def.'s Supp.App. Ex. 90 at 1182 (Defendant's Appraisal).

would not purchase property for the total amount of all revenue he would hope to receive from the sale of the timber and the land," *id.* at 1315–16. With respect to the sales comparison approach, Mr. Swafford notes that the approach is "a more appropriate and realistic method to determine fair market value," but opines that "despite the availability of more similar properties from which to choose, [Dr.] Burak has selected five benchmark properties that are quite different from the Cane properties in [timber volume, location, recreation potential, environmental liability, and size,] the characteristics most important to land valuation in this region." *Id.* at 1319. With respect to the income capitalization approach, Mr. Black states that while the approach is useful to timber companies comparing two timber properties to determine which will be more profitable to buy or sell, a landowner like Cane who is not part of the timber industry "do[es] not traditionally use the income approach for any timber purpose." *Id.* at 1317.

While Mr. Black discredits Dr. Burak's use of an income capitalization approach, which is based on a Timber Management Policy involving an analysis and discount of the anticipated net returns from managing Cane's timber, *see* Def.'s Supp.App. Ex. 92 at 1317–19 (2004 Black/Swafford Report); Def.'s Supp. App. Ex. 90 at 1208–15 (Defendant's Appraisal), Mr. Black employs a similar approach in rendering his opinion of the value of Cane's timber in June 2000, *see* Def.'s Supp.App. Ex. 92 at 1327–36 (2004 Black/Swafford Report). The court does not fully appreciate the purported distinction drawn by plaintiffs' expert Mr. Black between the income capitalization approach used by defendant's expert Dr. Burak and the Timber Management Plan used by plaintiffs' expert himself, two seemingly similar valuation methods that yielded substantially different results in the parties' expert reports. Defendant's expert Dr. Burak estimated Cane's timber value in June 2000, using the income capitalization approach, to be $4,490,000. Def.'s Supp.App. Ex. 90 at 1138. Plaintiffs' expert Mr. Black, using only a discounted cash flow analysis of a Timber Management Plan method of valuation, estimated Cane's timber value in June

2000 to be between -$193,240 and -$43,240. Def.'s Supp.App. Ex. 92 at 1336.

While plaintiffs supplemental expert report does contain an opinion of value just after the date of the alleged taking, it appears to the court that the value is greatly dependent on hindsight. Because plaintiffs' expert has employed a discounted cash flow analysis based on a Timber Management Plan rather than an estimate of stumpage value in determining the value of Cane's timber as of the date of the alleged taking, plaintiffs' expert has produced an opinion that focuses on "accounting for the variable circumstances that [will] have a huge impact on *the actual realizable value of the timber ... over time.*" Def.'s Supp.App. Ex. 92 at 1333 (emphasis added). As explained by Mr. Black, his valuation method looks forward from the date of the alleged taking to the "actual values derived from an ongoing and active Timber Management Plan," *id.* at 1315, and then uses a discounted cash flow analysis to determine what the value of Cane's timber would have been in June 2000, *id.* at 1335. Mr. Black acknowledges that, while his valuation opinion contemplates management of the timber on all of Cane's acreage "over the long term," *see id.* at 1332, "no one foresaw the unprecedented scope of the southern pine beetle epidemic that developed [from June 2000] throughout the following eighteen months," *id.* at 1334.

Plaintiffs' experts have produced an opinion, albeit flawed, estimating the value of Cane's timber just after the date of taking. One limitation of their report is the extent to which it appears to revive the valuation analysis contained in Mr. Black's previously stricken declaration, *see Cane IV*, 62 Fed.Cl. at 487; *Cane III*, 57 Fed.Cl. at 124–25, and the court questions the appropriateness of certain assumptions underlying the timber valuation method used by plaintiffs' expert. Plaintiffs' supplemental expert report fails to address qualitatively the assumptions underlying the variables considered by plaintiffs' experts in preparing their supplemental report. Plaintiffs' supplemental expert report also fails to address quantitatively the necessary adjustments to the stumpage value set forth in the earlier expert opinion of Mr.

Black. The 2004 Black/Swafford Report does, however, raise some questions about the assumptions underlying the supplemental reports prepared by defendant's experts. Because doubts about factual issues are resolved in favor of the party opposing summary judgment, *see Litton Indus. Prods.,* 755 F.2d at 163, the court declines to grant summary judgment on the issue of Cane's timber valuation.

### 2. Reasonableness of Plaintiffs' Investment–Backed Expectations

■ Defendant argues that Cane's investment-backed expectations were not reasonable. *See generally* Def.'s Mem. at 33–39. Distinguishing *Cienega Gardens* from this case, defendant explains that the former case involved " '[the] legislative abrogation of the key rule of a pre-existing regime,' " *id.* at 34 (quoting *Cienega Gardens,* 331 F.3d at 1346), while the latter "involves the application of an existing statutory scheme, the relevant portions of which have not been materially altered since Plaintiff acquired its property in 1979," *id.* at 35–36. Defendant asserts that, under the applicable "legal standard for determining the reasonableness of investment-backed expectations," the undisputed facts of this case require the conclusion "that Cane lack[ed] the reasonable investment-backed expectations it claims [were] interfered with by the government's application of a previously existing regulatory scheme." *Id.* at 39.

Plaintiffs argue that their investment-backed expectations were reasonable because, "[i]n January 1979, SMCRA [r]egulations [d]id [n]ot [p]rovide [f]or [u]nsuitability [d]eterminations [f]or [p]rivately [h]eld [l]and," Pl.'s Opp. at 26, and because, at the time Cane purchased its property, industry did not understand unsuitability determinations to "[t]hreaten [p]rivate [m]ining [l]ands," *id.* at 28. Plaintiffs contend that the case law recognizes that "[p]urchasers [o]f [c]oal [m]ining [p]roperty [a]fter [the][p]assage [o]f SMCRA [s]till [m]ay [h]ave [r]easonable [i]nvestment-[b]acked [e]xpectations." *Id.* at 30 (discussing *Appolo Fuels, Inc. v. United States,* 381 F.3d 1338 (Fed.Cir.2004) and *Palazzolo v. Rhode Is-*

*land,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)).

Before addressing the parties' arguments regarding the reasonableness of Cane's investment backed expectations, the court briefly reviews the context in which defendant's renewed motion for summary judgment on this issue arises. In *Cane IV,* the court "assess[ed] plaintiffs' reasonable investment-backed expectations in light of the Federal Circuit's guidance in *Cienega Gardens.*" 62 Fed.Cl. at 489. Quoting *Cienega Gardens,* the court stated:

> The purpose of consideration of plaintiffs' investment-backed expectations is to limit recoveries to property owners who can demonstrate that "they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor, [Inc. v. United States],* 28 F.3d [1171,] 1177 [(Fed. Cir.1994)]. This factor also incorporates an objective test—to support a claim for a regulatory taking, an investment-backed expectation must be "reasonable." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

*Cane IV,* 62 Fed.Cl. at 489 (quoting *Cienega Gardens,* 331 F.3d at 1345–46); *see also Maritrans Inc. v. United States,* 342 F.3d 1344, 1358 (Fed.Cir.2003) (stating that "[a]s far as reasonable, investment-backed expectations are concerned, [plaintiff] had to show that it acquired an interest in [its property] 'in reliance on a state of affairs that did not include the challenged regulatory regime' ") (quoting *Loveladies Harbor,* 28 F.3d at 1177). The court in *Cane IV* added that "the proper inquiry for the court 'is an objective, but fact-specific inquiry* into what, under all the circumstances, the [property] [o]wners should have anticipated.' " 62 Fed.Cl. at 489 (quoting *Cienega Gardens,* 331 F.3d at 1346).

The court found in *Cane IV* that "[b]ased on the record and in the complete absence of any other advice-particularly legal counsel-with respect to the regulatory risks under SMCRA for plaintiffs' investment in the coal mining operation, ... plaintiffs' expectations were shaped in light of a narrow consideration of SMCRA, specifically, the likelihood

of obtaining permits," *id.* at 490. The parties had presented to the court a limited evidentiary record that included an "optimistic assessment of the permitting process" required for a coal mining operation. *Id.* at 489–90 (internal quotations and citations omitted). The assessment was prepared for plaintiffs by two mining engineers and an economic geologist. *Id.* at 489. Plaintiffs also received a descriptive brochure prepared for plaintiffs by their investment advisors noting, among other investment risks, that the requisite permits "might not be attainable." *Id.* (internal quotations omitted). "The court concluded that such limited consideration of the regulatory scheme governing the coal mining operation that plaintiffs sought to undertake was not consistent with the conduct of a reasonably prudent investor." *Id.* at 490. However, in light of plaintiffs' assertions on reconsideration that the lack of evidence on this issue reflected the parties' failure to examine plaintiffs' knowledge about the possibility of an unsuitability petition during rounds of discovery, the court permitted the parties to conduct additional factual development and to submit supplemental briefing "with respect to the investment-backed expectations prong of the court's *Penn Central* analysis in light of *Cienega Gardens.*" *Id.*

Now, after an eight-month period of factual discovery, plaintiffs contend that an unsuitability petition "was not foreseeable to an investor in Cane's position in January 1979" because "[t]he first unsuitability petition concerning lands in Tennessee was not filed until 1984" and "only thirteen such petitions have been filed to date." Pls.' Opp. at 28 (citing Appendix to Cane's Opposition to the Government's Renewed Motion for Summary Judgment (Pls.' App.) Ex. 70 (Lands Unsuitable for Mining Petition Processed *at* http://welcome/unsuitability.htm (last updated Mar. 5, 2002))). Plaintiffs also point to the lack of any mention of the unsuitability designation process in publications by the Annual Rocky Mountain Mineral Law Institute dated 1985 and 1987, which address in the SMCRA discussion section "the scope of a proper due diligence investigation." *Id.* at 28–29 (citing Pls.' App. Exs. 72, 73 (two chapters from the referenced publication ad-

dressing the required due diligence and the environmental risks associated with the purchase of property for mining purposes)).

Plaintiffs also argue that neither Cane nor Colten, which was owned by the same investor as Cane, was advised of the unsuitability petition process during the due diligence investigations conducted in connection with Cane's acquisition of the property "because neither a major mining firm consultant, nor competent counsel, nor the Tennessee Division of Surface Mining and Reclamation itself considered that prospect a potential impediment to obtaining a permit to mine the Cane properties." Pls.' Opp. at 29. In making this assertion, plaintiffs rely, in part, on an opinion letter obtained from the Tennessee law firm Stophel, Caldwell & Heggie dated October 19, 1979 concerning the mining permit application of Cane's lessee, Eastern Minerals Corporation, *see* Pls.' Opp. at 29, stating:

> Based upon [the law firm's] review of the laws of the State of Tennessee, ... letters [from the Tennessee Department of Health (regarding the issuance of a National Pollutant Discharge Elimination System (NPDES) permit as required under the Clean Water Act) and from the Tennessee Division of Surface Mining and Reclamation (regarding the issuance of a surface mining permit),] and our telephone conversations with [the planning technician of the Tennessee Division of Surface Mining and Reclamation], the only condition precedent to the issuance of the Permit by the Division of Surface Mining and Reclamation of the Tennessee Department of Conservation to Eastern Minerals, Inc. is [a performance bond].

Pls.' Supp.App. Ex. 74 at 1860, 1863. The referenced letter from the Division of Surface Mining and Reclamation of the Tennessee Department of Conservation merely "acknowledge[s] receipt of [the] application for a surface mining permit" and lists the performance bond as an item "needed to complete [the] application." *Id.* at 1863. It appears to the court that this contemporaneous evidence from the Division of Surface Mining and Reclamation of the Tennessee Department of Conservation on which plaintiffs rely does

not speak to the entire range of "potential impediment[s] to obtaining a permit to mine the Cane properties," Pls.' Opp. at 29, but simply addresses the narrow issue of the technical requirements for submitting a complete application for a surface mining permit.

In assessing the reasonableness of plaintiff's expectations, the court considers that Federal Circuit's recent decision in *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338 (Fed.Cir.2004) affirming this court's finding that an unsuitability determination under section 1272 of SMCRA did not effect a compensable partial regulatory taking of plaintiff's mining leases. *Id.* at 1341. In conducting the *Penn Central* analysis of Appolo's takings claim, the Federal Circuit addressed at some length whether the coal mining company's investment-backed expectations were reasonable. *See id.* at 1348–50. Because the takings claim in *Appolo Fuels* involves the same regulatory scheme at issue in this action, the Federal Circuit's guidance in that case is particularly instructive here.

Appolo, a Kentucky corporation, "entered the mining business in 1972." *Id.* at 1342. Appolo acquired the leases at issue in the litigation in 1989, in 1992, in 1995, and in February and June of 1996.[9] *Id.* at 1342–43. In 1994, Appolo filed a SMCRA permit application to mine on a portion of its leased lands. *Id.* at 1342. Not long thereafter, the City of Middlesboro, Kentucky and the National Parks and Conservation Association filed a petition with the Office of Surface Mining Reclamation and Enforcement (OSM) seeking a lands unsuitable for mining (LUM) designation. *Id.* at 1342–43. In September 1996, OSM granted the LUM petition. *Id.* at 1343. Appolo filed a takings claim in this court in January 2000. *Id.* at 1344. Finding that plaintiff failed to present "sufficient evidence to preclude summary judgment on its categorical regulatory takings claim, its partial regulatory takings claim, and its temporary takings claim," *Appolo Fuels, Inc. v. United States*, 54 Fed.Cl. 717, 741 (2002), the

Court of Federal Claims granted defendant's motion for summary judgment, *id.*

On appeal, the Federal Circuit considered "as a preliminary matter, ... whether the enactment of SMCRA in 1977, before acquisition of the [property] in question, defeats [the plaintiff's] reasonable investment-backed expectations." *Appolo Fuels*, 381 F.3d at 1348. The Circuit Court stated that in *Rith Energy, Inc. v. United States*, 270 F.3d 1347 (Fed.Cir.2001) (*Rith II*), which it decided shortly after the Supreme Court's decision in *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), it had "concluded that *Palazzolo* did not reject the principle that 'the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of [a plaintiff's investment-backed] expectations' [and][l]ikewise, ... conclude[d] that Appolo's reasonable investment-backed expectations [were] shaped by the regulatory regime in place as of the date it purchased the [mining] leases at issue." *Appolo Fuels*, 381 F.3d at 1349 (internal citation and quotation omitted).

To determine whether Appolo's expectations under the existing regulatory regime were reasonable, the Federal Circuit considered:

> (1) whether the plaintiff operated in a "highly regulated industry;" (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have "reasonably anticipated" the possibility of such regulation in light of the "regulatory environment" at the time of purchase.

*Id.* (citing *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed.Cir. 2001)).[10] The Federal Circuit found:

> First, ... the coal mining business is obviously "a highly regulated industry" ... and the SMCRA's comprehensive statutory and regulatory system has been in ef-

---

9. Appolo also acquired leases containing mining rights in the LUM area in 1997 and in 2001. 381 F.3d at 1343.

10. Although *Commonwealth Edison* "considered reasonable investment-backed expectations in the

context of a due process claim," the Federal Circuit determined that the analysis in *Commonwealth Edison* applied "equally ... in the takings context." *Appolo Fuels*, 381 F.3d at 1349 n. 5 (citations omitted).

fect since Appolo's early years in the industry and predates Appolo's purchases of any of the leases at issue in this litigation. Second, there is no suggestion here that Appolo was unaware that surface mining was a potentially hazardous activity. Third, in light of the regulatory environment at the time Appollo purchased the lease at issue, it could have "reasonably anticipated" the possibility of a LUM decision prohibiting the mining of part or all of its leases.

381 F.3d at 1349. The Federal Circuit determined that SMCRA "gave notice sufficient to defeat Appolo's reasonable expectations by providing for a process by which OSM could designate lands as unsuitable for mining under a broad array of circumstances [and found that] Appolo ... identified no regulatory decision pursuant to SMCRA that would have suggested that the LUM petitions were unavailable in the circumstances such as the ones here." *Id.* at 1350. Noting that " '[t]he critical question is whether extension of existing law could be foreseen as reasonably possible,' " *id.* (quoting *Commonwealth Edison*, 271 F.3d at 1357), the Federal Circuit concluded that the " 'broad scope' of the SMCRA's LUM provisions made OSM's designation of Appolo's lands as unsuitable for mining 'easily foreseen, not necessarily as a certainty, but as a reasonable possibility,' " *id.* (quoting *Commonwealth Edison*, 271 F.3d at 1357).

In this case, as in *Appolo Fuels*, there is no dispute that the provisions of SMCRA requiring permits as a precondition to mining were enacted 1977 and existed in 1979 when plaintiffs acquired their property. *See* Def.'s Mot. at 35–36; Pls.' Opp. at 26–28. However, unlike the plaintiff in *Appolo Fuels*, Cane acquired its properties soon after the enactment of SMCRA and was not aware of the existence of the unsuitability petition process. *Compare Appolo Fuels*, 381 F.3d at 1342, 1349 (discussing plaintiff's acquisition of the first lease in issue "more than a decade after the enactment of SMCRA" and plaintiff's "stat[ement] on appeal that it was acutely familiar with the SMCRA statutory and regulatory system"), *with Cane IV*, 62 Fed.Cl. at 489 ("[P]laintiffs do not dispute that they were actually ignorant of the petition process."). To distinguish further the facts in this case from the facts in *Appolo Fuels*, plaintiffs draw the court's attention to the statutory text of section 1272 of SMCRA and the interim rules in effect in January 1979, the time of Cane's acquisition of the property at issue.[11] Pls.' Opp. at 26. Plaintiffs argue that statutory text of section 1272 of SMCRA and the "interim rules in effect in January 1979" provided for unsuitability determinations only for state or federal lands—not for private lands. *Id.* Plaintiffs contend that, prior to March 1979 when the final rules implementing section 1272 of SMCRA were promulgated,[12] "it simply was not foreseeable that ...a petition to designate as unsuitable [for surface coal mining operations] an *area composed entirely of private lands* " could be based either on the incompatibility of the operations with existing land use plans or on the effect of the operations on fragile lands. *Id.* (emphasis added).

Plaintiffs' argument that a property composed entirely of private lands could not be subject to an unsuitability petition under the proposed rule is incorrect. Plaintiffs' argument appears to be based on a misreading of the language "lands of a State" in section 1272 of SMCRA. Section 1272 of the Act, which was in place at the time of the statute's enactment, requires that, prior to federal delegation of primary regulatory authority under the Act to a state, the state must establish a process "enabling objective *decisions* based upon competent and scientifically sound data and information *as to which*, if any, *land areas of a State are unsuitable for* all or certain types of *surface coal mining operations.*" *See* Surface Mining Control

---

11. The proposed rules were published on September 18, 1978. *See* Surface Mining and Reclamation Operations Permanent Regulatory Program, 43 Fed.Reg. 41,662, 41,825–41,833 (Sept. 18, 1978) (proposed rules) (Subchapter F addressing areas unsuitable for mining).

12. The final rules were published on March 13, 1979. *See* Surface Mining and Reclamation Operations Permanent Regulatory Program, 44 Fed. Reg. 14,902, 15,341–15,349 (Mar. 13, 1979) (final rules) (codified at 30 C.F.R. §§ 760.1–769.18) (Subchapter F addressing areas unsuitable for mining).

and Reclamation Act of 1977, § 522(a)(1), Pub.L. No. 95–87, 91 Stat. 445, 507 (now codified at 30 U.S.C. § 1272(a)(1) (emphasis added)).

The phrase "lands of a State" refers to all lands within a state rather than to the public lands of a state and, contrary to plaintiffs' assertions, the proposed rule applied to both public and private lands. The preamble to the proposed rule states in pertinent part that "[l]ands covered by the [LUM] petition process are *all private* and State-owned *lands* within a State." Surface Mining and Reclamation Operations Permanent Regulatory Program, 43 Fed.Reg. 41,662, 41,683 (Sept. 18, 1978) (proposed rules) (Subchapter F addressing areas unsuitable for mining) (emphasis added). The language of the statute and the pertinent regulation clearly delineate an unsuitability petition process that applies to all lands.

Moreover, as defendant argues, in light of the regulatory regime in place at the time Cane acquired the subject property, plaintiffs' argument about the reasonableness of its investment-backed expectations "must be rejected because it is based on an erroneous interpretation of SMCRA." [13] Def.'s Reply at 13. Pointing to the text of section 1272 of SMCRA, the provision for designating areas unsuitable for surface coal mining operations, defendant asserts that "[n]othing in this section excludes private lands from its applicability." *Id.* Nor does the legislative history of SMCRA even suggest the exemption of private lands from the unsuitability petition

process. *Id.* at 13–14 (noting that, like section 1272 of SMCRA, the legislative history "indicates that this program applies to 'all land areas in a state' ") (citing H.R. Rep. 95–218, 95th Cong., 1st Sess. (Apr. 22, 1977)).

Section 1272 of SMCRA requires that each state establish an objective petition process for determining "*which,* if any, *lands of a State are unsuitable for* all or certain types of *surface coal mining operations.*" [14] *See* Surface Mining Control and Reclamation Act of 1977, § 522(a)(1), Pub.L. No. 95–87, 91 Stat. 445, 507 (now codified at 30 U.S.C. § 1272(a)(1) (emphasis added)). Section 1272 of the Act also provides that "[a]ny person having an interest which is or may be adversely affected shall have the right to petition the regulatory authority to have an area designated as unsuitable for surface coal mining operations, or to have such a designation terminated." *Id.* § 1272(c); *see also* Surface Mining Control and Reclamation Act of 1977, § 522(c), Pub.L. No. 95–87, 91 Stat. 445, 508 (now codified at 30 U.S.C. § 1272(c)). Section 1260(b)(4) of SMCRA, which was also part of the Act as enacted in 1977, establishes as one of the requirements for the approval of a mining permit application "the absence of a LUM designation or proceeding." Def.'s Reply at 13 n. 7 (citing 30 U.S.C. § 1260(b)); *see also* Surface Mining Control and Reclamation Act of 1977, § 510(b)(4), Pub.L. No. 95–87, 91 Stat. 445, 481 (now codified at 30 U.S.C. § 1260(b)(4)). The applicability of the unsuitability petition

13. Defendant also points out that plaintiffs incorrectly described the regulatory regime in place prior to Cane's acquisition of the property interests at issue. *See* Def.'s Reply at 14. Defendant explains that the language limiting the applicability of the unsuitability petition process to which plaintiffs cited and on which plaintiffs relied in their briefing was actually language contained in the preamble to a *"proposed* rule" rather than an *"interim* rule." *Id.* (citation omitted). Defendant is correct. *See* Surface Mining and Reclamation Operations Permanent Regulatory Program, 43 Fed.Reg. 41,662, 41,825–41,-833 (Sept. 18, 1978) (proposed rules) (Subchapter F addressing areas unsuitable for mining).

Although an agency may "find[] a need to issue interim rules to fill a gap[,] . . . courts tend to scrutinize such interim rules very closely." 1 Charles H. Koch, Jr., Admin. L. & Prac. § 4.21[2] (2d ed. 1997) (1 Koch). Proposed

rules generally serve to provide notice of an agency's potential regulatory undertaking "disclos[ing] all of the questions the agency has and the issues the agency feels it must resolve in order to issue a final rule." 1 Koch, § 4.32.

14. As explained in *Eastern Minerals International, Inc. v. United States,* 36 Fed.Cl. 541 (1996), *rev'd on other grounds, Wyatt v. United States,* 271 F.3d 1090 (Fed.Cir.2001):

SMCRA required states to develop regulatory programs for mining or submit to a federal program. . . . Until 1982, Tennessee administered the Act under federal provisions. In August 1982, Tennessee received conditional approval of a permanent regulatory program. In 1984, the Interior Department's Office of Surface Mining assumed direct federal enforcement of Tennessee's program.

*Id.* at 544–45.

process to all "land areas in a State" is also reflected in the legislative history of SMCRA. *See* H.R. Rep. 95–218, 95th Cong., 1st Sess., at 92, 94 (Apr. 22, 1977) (stating that "in its review of [a permit] application, the regulatory authority must determine specifically that the affected land does not lie within an area ... under designation as unsuitable for mining pursuant to section 522" and requiring a state, as a precondition to assuming regulatory authority, to establish "a process designed to provide the technical data needed to enable the regulatory authority to make objective decisions as to which, if any, *land areas in a State* are unsuitable for all or certain types of surface mining") (emphasis added).

The court must determine, in light of the Federal Circuit's guidance in *Appolo Fuels*, whether Cane's investment-backed expectations as shaped by its reliance on "the regulatory regime in place as of the date it purchased [the property] at issue" were reasonable. 381 F.3d at 1349. The court's inquiry " 'is an objective, but fact specific inquiry into what, under all the circumstances, the [property] [o]wners should have anticipated.' " *Cane IV*, 62 Fed.Cl. at 489 (quoting *Cienega Gardens*, 331 F.3d at 1346) (emphasis omitted). Notwithstanding Cane's acquisition of its property shortly after the enactment of SMCRA and its own acknowledged ignorance about the unsuitability petition process, the court finds that the enforcement of the LUM provisions of SMCRA was foreseeable as a reasonable possibility even if not foreseeable as a certainty. Based on the language of section 1260 of SMCRA, plaintiffs had notice of the potential for a LUM petition to interfere with the approval of a permit application. Here, as the Federal Circuit in *Appolo Fuels* observed, SMCRA "gave notice sufficient to defeat [plaintiffs'] reasonable expectations by providing for a process by which [the Secretary] could designate lands as unsuitable for mining under a broad array of circumstances [and] [plaintiffs] ... identified no regulatory decision pursuant to SMCRA that would have suggested that the LUM petitions were unavailable in the circumstances such as the ones here." *Appolo Fuels*, 381 F.3d at 1350.

Because SMCRA was a relatively new regulatory scheme at the time that Cane purchased its property, uncertainty about how the statute might function was reasonable. But that uncertainty served to enlarge the risks associated with pursuing an investment in mining operations because there was no indication as to which statutory provisions would be enforced. Accordingly, any assumption that provisions like the LUM provisions would not be enforced could not have been the basis of a reasonable expectation. In *Appolo Fuels*, plaintiff urged that "years of practical experience in the mining industry led it to believe that a LUM petition would not be filed in the first instance and once filed, would not be granted by OSM." 381 F.3d at 1349. Here, by contrast, the plaintiffs were faced with a statute and regulation applicable to them and no history of regulatory non-enforcement on which to rely. The factual support for plaintiffs' opposition to the government's renewed motion for summary judgment on this issue focuses entirely on the purported low visibility of the LUM petition process in the years following Cane's acquisition of the property. *See* Pl.'s Opp. at 28–30. If it would ever have been reasonable for Cane to rely on such perceptions, Cane could not have relied on them in 1979. Accordingly, the court determines that Cane's investment-backed expectations based on the regulatory regime in place at the time it acquired the property at issue here were not reasonable.

## III.  Conclusion

For the foregoing reasons, Defendant's Renewed Motion for Summary Judgment as to Cane's Permanent Regulatory Takings Claim is DENIED on the issue of economic impact based on the genuine issues of material fact concerning Cane's timber valuation. Defendant's motion is GRANTED on the issue of reasonableness of Cane's investment-backed expectations. The court will conduct an evidentiary hearing, expected to focus on the testimony of the parties' experts, on the issue of economic impact. On or before February 10, 2005, the parties shall submit a joint status report, or if they cannot agree,

separate reports, proposing further proceedings.

IT IS SO ORDERED.